# Naylor *v.* Naylor, Appellant.

*Divorce—Master's report—Findings of fact—Duty of appellate court to review the evidence—Testimony of hired detectives.*

1. The findings of fact of a master in divorce do not have the same force as the report of a referee in a civil case, or the decision of the court in a case tried by the court without a jury; but the appellate court is bound to give the evidence a careful consideration in order to ascertain whether it does in very truth establish the statutory grounds for a divorce. This principle applies whether the master's report be in favor of or against the granting of the divorce.

2. While it is true that it is the duty of the court to give consideration to the opinion of a master in divorce, particularly where the veracity of the witnesses is involved, even then the court must exercise its judgment from an examination and consideration of the evidence, and is in no sense bound to adopt the finding of the master or to treat it as casting the burden on the party excepting to his report.

3. Where a master's findings of fact are not distinctly based upon his belief or disbelief of the witnesses, but upon a supposed policy of law affecting their credibility, the court is as well able as he, to judge of the extent to which this supposed policy of law should be carried in determining their credibility.

4. The statement of a master in divorce, that his reason for recommending that the libel be dismissed, was based upon the fact that the testimony for the libelant consisted mainly of that of hired detectives, does not disclose a proper ground for his decision, inasmuch as there is no fixed rule of law or public policy which forbids the granting of a divorce upon the testimony of hired detectives.

5. The testimony of hired detectives in a divorce case should be scrutinized with great care, but the court will act upon it, if, by reason of its volume, its clear, distinct and positive nature, the harmony of each of its parts with the others, and its harmony as a whole with the other facts in the case, it induces an abiding conviction of its truth.

*Divorce—Counsel fee—Expenses.*

6. In the absence of a plain abuse of discretion by the lower court in refusing to allow a wife's claim in excess of a certain amount as counsel fee and expenses, the appellate court will not review a decree on the subject made by the lower court.

7. Where a lieutenant in the United States Army has secured a decree in divorce, an order will not be made upon him for the payment of expenses incurred by the wife where it appears that he has paid her alimony pendente lite, also a considerable amount as counsel fee, and

all the costs of the case including master's and stenographer's charges, and the expense of taking testimony on behalf of the respondent, as well as in his own behalf, in other states.

Argued Dec. 4, 1914.   Appeal, No. 156, Oct. T., 1914, by defendant, from decree of C. P. No. 3, Phila. Co., Dec. T., 1910, No. 40, granting divorce in case of Charles J. Naylor *v.* Fredericka Stephens Naylor. Before RICE, P. J., ORLADY, HEAD, KEPHART and TREXLER, JJ.   Affirmed.

Libel in divorce.
Exceptions to report of master.

The court below filed the following per curiam opinion.

This is a proceeding in divorce instituted by a husband against his wife on the ground of adultery.   Hearings were had before a master, who reported adversely to the libelant and recommended that the libel be dismissed.   We have before us exceptions to this report.

It was said in Howe v. Howe, 16 Pa. Superior Ct. 193: "Of whatever drudgery the court of original jurisdiction may relieve itself in this class of cases by appointing a master, neither it nor we can escape the burden of a careful consideration of the evidence in order to ascertain whether it does in very truth establish the statutory grounds for a divorce."   The rule quoted must of necessity apply when the master has recommended that the libel be dismissed.

It is difficult in an opinion to make a complete review of all the evidence in this case.   It is sufficient for our purpose to refer to certain features.   The libelant is an officer in the United States Army, and in the month of September, 1910, he was stationed at Newark, New Jersey.   For some time previous to September 24 he had become suspicious of the relations existing between his wife and one Allen D. O'Bryan, a man

employed by an army contracting firm. O'Bryan had met the libelant and his wife at a Western army post, and renewed his acquaintance with them in Newark. The libelant and O'Bryan were both of convivial habits, and had many times become intoxicated together. O'Bryan spent much of his time at the libelant's house, frequently staying there all night. Libelant testified that on one occasion he went downstairs early in the morning and discovered his wife in the arms of O'Bryan. On another occasion he was informed by his child that O'Bryan had been on a Fall River steamer when the respondent and her children were on the way to New England to make a visit to libelant's people. These facts, with others, caused the libelant to be suspicious and he examined his apartments and discovered a number of letters which were written by O'Bryan to the respondent. These letters were offered in evidence, and to state it mildly, were of an exceedingly affectionate character. The libelant then employed a firm of detectives to shadow his wife and O'Bryan. The result of their investigation was the development of the fact that O'Bryan and the respondent were at the Hotel Braddock on One Hundred and Twenty-fifth Street, New York City, on September 24, 1910.

The libel charges the respondent with adultery on September 24, 1910, with Allen D. O'Bryan at the Hotel Braddock, and the evidence to sustain this charge is that of three men employed by the detective firm and another man who was a friend of counsel for the libelant.

Mrs. Naylor was shadowed by two of the detectives from Newark to New York City, where she met O'Bryan. According to the evidence of these witnesses, the respondent and O'Bryan went into an hotel in the southern part of New York City for a short space of time. They were then followed to the Hotel Braddock, on One hundred and Twenty-fifth street, which hotel is described by these witnesses as a house

of assignation. The lady sat in a waiting room while O'Bryan went to the desk, with one of the witnesses standing close by. While the witness did not actually see O'Bryan write his name, he had the appearance of one writing his name on the register. As soon as he left the desk, the witnesses approached and registered underneath the signature, "J. H. Henbent and wife, Scranton, Pa." Room 82. The witness testified that the ink on the signature above his own was fresh, and the witness was assigned to Room 88. That was at about twelve o'clock noon. The room to which the witness was assigned was on the opposite side of the hall from Room 82.

The two detectives telephoned to their chief, who in a short while appeared with the witness Clem. Clem was not a detective, but as was above stated, was a friend of counsel for the libelant. These four witnesses spent the time until half-past six o'clock P. M. in and about the room opposite Room 82, and at six-thirty the four witnesses saw O'Bryan and the respondent leave the room and take the elevator. They subsequently saw them in the cafe from which place on being scrutinized they hurriedly left the building. The witnesses carefully examined the faces of the two persons as they took the elevator, and examined the room they had lately vacated, seeing evidences of the room having been used, the bed with signs indicating that it had been occupied, the washstand and towels having been used. The libelant testified that his wife arrived home at Newark that night at about eight o'clock.

The respondent and O'Bryan testified substantially to this effect: That O'Bryan had invited libelant and his wife to go to the Polo Grounds in New York City to witness a baseball game or attend a matinee; that libelant had declined to go, but that the respondent accepted the invitation; that she had often spent the day or part of the day in New York with O'Bryan, with the knowledge and consent of her husband, and that they had gone to ball games and matinees and

other entertainments. They both testified that they met down town in the city of New York on the day in question; that they had some drinks at the Hotel Astor; that for the purpose of obtaining a sea food luncheon they went to One Hundred and Twenty-fifth street near which there was a restaurant known to O'Bryan; that they went to the Hotel Braddock for the purpose of obtaining some drinks, arriving there approximately at one o'clock; that after refreshing themselves at the Hotel Braddock they went to the restaurant nearby and had luncheon, after which they had returned to the Hotel Braddock because O'Bryan was somewhat nauseated by his lunch. There they had some more drinks and proceeded to the Polo Grounds and witnessed the baseball game. After the game they returned to the Hotel Braddock, where they had more drinks, the reason assigned for stopping at One Hundred and Twenty-fifth street on their return being that the respondent wished to do some telephoning and O'Bryan wished to buy some tobacco at a certain store in that neighborhood. The respondent testified that she arrived home at about 6.30 P. M.

The defense offered in addition the evidence of certain employees of the Hotel Braddock and of the restaurant at which the parties had luncheon, for the purpose of establishing that the only part of the hotel occupied by these people on the day in question was the cafe, and also that they did obtain their lunch at a place other than the Hotel Braddock. These witnesses were confronted by O'Bryan and the respondent in the company of counsel for the respondent some days after September 24. It appeared that immediately upon obtaining information from the detectives the libelant separated from his wife and, through counsel, respondent became informed of the charge against her, whereupon her counsel called upon counsel for the libelant and was made acquainted with the nature of the charge. Respondent's counsel afterwards arranged to bring the

parties into the presence of the servants of the Hotel Braddock and the restaurant. The exact date when this occurred is not fixed by anyone. No memorandum was made as to when it occurred, but a mere estimate was given with relation to certain other events.

The respondent and O'Bryan denied that they occupied a bed room at the Hotel Braddock, denied that there ever had been any illicit relations between them, and the respondent denied that her husband discovered her in the arms of O'Bryan in the early morning at her home on the occasion referred to by libelant. They both explained the letters as being letters which were usual and customary in the loose social life at army posts, and that while they were affectionate in character, they were known to libelant, and, in fact, the respondent said that she scarcely ever read them, and that they were always shown to her husband as silly manifestations on the part of O'Bryan. There was also evidence produced on the part of the respondent of a witness who visited her home on the evening in question, tending to show that she arrived home before the hour fixed by her husband. O'Bryan testified that he did not sign "J. H. Henbent and wife" on the register in the Hotel Braddock. With reference to this signature the libelant produced David H. Carvalho, a handwriting expert from New York, who expressed the opinion that the hand that wrote the letters which were admitted also wrote the name upon the hotel register. The respondent produced a teller and a clerk from one of the trust companies in Philadelphia, who testified that the writings were not by the same hand, and that the name on the hotel register was written by some one who was attempting to simulate the handwriting of O'Bryan. By an examination of the hotel register, however, it also appeared that on a number of previous occasions the same signature of "J. H. Henbent and wife, Scranton, Pa.," appeared.

In rebuttal the respondent was confronted by a letter

written by her to her husband, in which she attempted
to explain the affair when she was found in O'Bryan's
arms in the early morning. In this letter she begged
her husband not "to get mad" and endeavored to
justify herself and establish the innocence of her conduct by explaining that O'Bryan was showing the
awkward position in which another woman desired
to have one make love to her.

The learned master in his report has briefly stated
the evidence of the different witnesses. He makes no
specific finding of the fact. He does not state that he
disbelieves the testimony of the witnesses for the libelant, nor that he believes the testimony of the witnesses
for the respondent. After a brief discussion of the
evidence, he comes to the conclusion that the libel
should be dismissed for the reason that the testimony
"on which he is asked to make a finding in favor of
the libelant and against the respondent consists mainly
of the testimony of hired detectives." The master
criticises the detectives because they failed to call the
attention of the hotel proprietor or of some of his employees to the fact that the parties were occupying
the room and that they did not have a warrant sworn
out for their arrest, and that no disinterested parties
were brought in to witness the fact that the respondent and O'Bryan were together. He concedes that
the letters from O'Bryan to respondent cannot be condoned from the standpoint of good morals and that
they are indiscreet, to say the least, and couched in
terms that should not be used by a single man to a
married woman, yet as letters they are not ground for
divorce and do not substantiate the charge of adultery
as averred in the libel. He makes no comment on the
matter of the signature upon the hotel register, nor on
the evidence of those who testified upon the handwriting feature of the case.

We are unable to concur with the master in the
conclusion to which he arrived, and after a laborious

examination of the evidence, we have come to the conclusion that the fact of adultery is established. It is not necessary to prove the act of adultery, but when a married woman occupies a room in an hotel with a man other than her husband, the law assumes that they went there for no other purpose than to commit the crime of adultery. In this case there can be no doubt that O'Bryan wrote letters to respondent that were more than indiscreet. Their contents, as well as the fact that some of them were sent to the General Delivery at Newark, New Jersey, rebut every idea of innocence in the relations between the parties. It is unbelievable that the respondent gave these letters to her husband as she testified, and that she never read them herself. It can readily be believed, as the libelant testified, that they were found hidden in the closet. There is no doubt also that the respondent was discovered by her husband early one morning at his own house, in the arms of O'Bryan. The libelant testified to this fact and stated that she was in a dressing gown. The respondent denied it, and afterwards was obliged to admit the writing of the letter excusing this conduct. With these facts in mind, showing the relations between these parties, it is difficult to believe the evidence of the respondent and her paramour as to what occurred at the Hotel Braddock on September 24.

The witnesses all agree that respondent and O'Bryan arrived at the Hotel Braddock somewhere about the middle of the day in question, and that they were in the house and left it for the last time late in the afternoon. The evidence for the libelant is to the effect that they stayed continuously in Room 82 from the time of their arrival until their departure, the evidence of the respondent being to the effect that they occupied no other room than the cafe, but that they were in the hotel three times that day between noon and six o'clock. It is altogether remarkable that people familiar with New York as they were, having vis-

ited that city often together, on a day devoted to a visit to the Polo Grounds at One Hundred and Fifty-fifth street, to witness a ball game, should have selected an obscure restaurant on One Hundred and Twenty-fifth street for luncheon, breaking their journey at this point, instead of taking luncheon downtown, and in the more frequented section of the city. It is difficult to understand why they did not obtain their luncheon downtown and go to the Polo Grounds direct. The necessity for their going to One Hundred and Twenty-fifth street for lobster is not clear.

We are unable to dismiss the testimony of the witnesses for the libelant in the summary manner in which the master has disposed of it. It might be that they could have done other things than they did, but the question to be determined is whether or not the evidence of these witnesses is to be disregarded altogether. We thoroughly concur in the views stated in the decisions quoted in the master's report, that the evidence of detectives in cases of this sort, is to be scrutinized with great care, but if it is not to be considered at all, then it would logically follow that a detective is incompetent to testify. If he is competent, then his testimony must be considered, and it cannot be dismissed altogether as unworthy of consideration because of the nature of his business. If the three detectives employed by the libelant were the only witnesses as to the facts, and if the master had found that the respondent and O'Bryan were not in Room 82 of the Hotel Braddock on the day in question, and had stated as his reason for so finding that he believed the evidence of the respondent and O'Bryan and disbelieved the evidence of the three detectives because they were detectives, or because they were unworthy of belief, we would have been confronted by another situation. The master, however, has concluded that because the evidence is "mainly" that of "hired detectives," the case is not made out, leaving it altogether

to conjecture whether or not he believed or disbelieved their evidence. It would seem as if he had concluded that their evidence could not be considered at all, owing to the nature of their business. If this was his view we cannot concur in it.

But aside from this, the master apparently excludes from consideration altogether the evidence of the witness Clem. This man was not a hired detective. He occupied rather the position as a witness which the master thought some one should have occupied, in order to make the testimony of the detectives worthy of consideration.

If Clem's evidence is to be considered, he is corroborated by three witnesses, who are opposed by the two persons who have every reason in the world to lie if they are guilty. Clem was taken to the Hotel Braddock on the day in question and introduced to two of the detectives by the third as their witness. So far as we have been able to discover, his testimony was not broken down. It is true he was apparently there for the purpose of witnessing the misconduct of the respondent. We fail to see why his testimony should be discredited because of that fact. When there is such misconduct it is an unpleasant task for anyone to be called upon to witness it, but the persons who are misconducting themselves do not do so in public. If the crime of adultery had to be established by the testimony of casual passersby, it would never be proved. The evidence of the detectives in this case is that two of them having followed the respondent to the hotel in question, they telephoned to their chief who brought Clem with them as a witness. We fail to see under the circumstances why there was a necessity on the part of these detectives to swear out a warrant or to send for the libelant, or to call in the proprietor or employees of the hotel, to commit a breach of the peace, for the purpose of having a cloud of witnesses. If the hotel was of the character given to it by some of the witnesses, it is very dubious if any reliance could have

been placed by the detectives upon the testimony of its employees.

It is established as a fact that the respondent and O'Bryan were in the Hotel Braddock for a part of the afternoon of September 24, 1910, they declaring that they did not occupy a bedroom and that they only visited the hotel for liquid refreshments. On the other hand, we have the testimony of three detectives, which testimony must be scrutinized carefully, it is true, and the witness Clem, who corroborates the detectives. These witnesses identified the respondent, who was present at the hearing, as the lady who occupied the room, and they identified O'Bryan by his photograph, which was exhibited to them. The master criticises the testimony of one of the detectives because he said that O'Bryan had dark, and the master states that he has light hair. This is the only matter in their testimony to which the master calls attention other than his criticism of the fact that they did not call other witnesses. The matter of the hair is a trifling one to refer to, in our opinion. What constitutes light hair and what constitutes dark hair is a matter for an infinite variety of opinion. The witnesses had the man's picture before them when they testified, and the variance in the testimony, on the shade of his hair, seems to us too insubstantial for discussion.

We are of opinion that the evidence of the employees of the hotel and of the restaurant is entirely too dubious for serious consideration. It lacks the certainty necessary to give it value.

There remains to be considered the matter of the handwriting upon the hotel register. One witness testified that the name "Henbent" was fresh on the register when he followed O'Bryan to the desk. The one who signed the name "Henbent" was assigned to Room 82, and the detective identified the person who came out of Room 82 with the respondent as the man who signed the register and whose picture was before

him when he testified. We have examined the photographs of the signature and compared them with the admitted handwriting of O'Bryan in the letters. To our untrained eyes there is a very great similarity between them. It is sufficient to refer to the unusual formation of the letter "r" in the midst of a word in the letters, to see a striking similarity to the third and sixth letters in the name called "Henbent" by the witnesses. If they were written by the same person the unusual name "Henbent" would be changed to the not unusual one of "Herbert." The master, as above stated, has not indicated what impression the evidence on this point made upon his mind. If the testimony of handwriting experts is of value, it would seem that the testimony of one who has made a study of the subject scientifically is of more value than that of clerks in banks, who never made any study of the subject at all and whose experience consisted of comparing signatures in the course of a banking business with the view of determining whether or not some were genuine. The evidence of the witnesses and the photographs of the handwritings, taken into consideration with the fact that O'Bryan was in the Hotel Braddock at or about the time the witness said he saw him standing in front of the hotel register; that he subsequently came out of Room 82, which was the room to which Henbent was assigned, lead us to conclude that the name upon the register was written by O'Bryan.

We have, therefore, O'Bryan writing to a woman not his wife, letters which were highly improper and immoral; we have him in her home early in the morning embracing her. These do not establish adultery, it is true, but they serve to assist to a conclusion upon the main question. We have the name written upon the hotel register in a handwriting strikingly similar to that of O'Bryan and expert evidence that they were written by the same hand. These facts, in connection with the evidence of Clem and the three detectives, lead

us to conclude that the libelant's case is established and that the respondent did on the day in question commit adultery with O'Bryan at the Hotel Braddock in New York City.

And now, to wit, this fourteenth day of April, A. D. 1914, after examination and consideration of the evidence in the above case, it is ordered that the findings and conclusions of the master are reversed. It is found as a fact that the respondent did on the twenty-fourth day of September, A. D. 1910, commit adultery with one Allen D. O'Bryan. It is therefore concluded that the allegations of the libel are sustained and libelant entitled to a divorce.

Let final rule for divorce a. v. m. issue.

*Error assigned* was the order of the court, quoting it.

*John R. K. Scott,* for appellant.

*Edward P. Bliss,* for appellee.

OPINION BY RICE, P. J., May 24, 1915:

The learned counsel for the appellant complains that the court did not give due weight to the master's report. He likens the report of a master in a divorce case to the report of a referee in a civil case, and to the decision of the court in a case tried without a jury or in a divorce case where the testimony is taken in open court, citing McMillan v. McMillan, 183 Pa. 91; Krug v. Krug, 22 Pa. Superior Ct. 572, and King v. King, 36 Pa. Superior Ct. 33. But under our decisions the analogy is not perfect. Ever since the decision in Middleton v. Middleton, 187 Pa. 612, the principle that should guide the court of original jurisdiction, as well as the appellate court, in the decision of this class of cases, has been well settled. Thus, in Howe v. Howe, 16 Pa. Superior Ct. 193, this court, speaking through Judge ORLADY, said: "Of whatever drudgery the court of original jurisdiction may relieve itself in this class

of cases by appointing an examiner, neither it nor we can escape the burden of a careful consideration of the evidence in order to ascertain whether it does, in very truth, establish the statutory grounds for a divorce." The same principle applies whether the master's report be in favor of or against the granting of the divorce. The case cited is an illustrative precedent; for there this court, upon a review of the evidence, concluded that it made out a case entitling the libelant to a divorce, and in reversing the decree necessarily reversed the master's findings which had been approved by the common pleas. Again, n Edgar v. Edgar, 23 Pa. Superior Ct. 220, it was distinctly declared that the Act of March 10, 1899, P. L. 8, which provides for the appointment of a master in a divorce proceeding "who shall take the testimony and return the same, together with a report of the proceedings before him and his opinion of the case to the court," was not intended to substitute the opinion of the master for a trial by jury or for full consideration of the evidence by the court which makes the final decree. "The opinion of the master is merely advisory to the court, which it may accept and act upon, or disregard in whole or in part, according to its own judgment as to the weight of the evidence or his legal conclusions. It was not intended that the court should abrogate its duty to determine by its own judgment the controversy presented and devolve that duty upon one of its officers." It is undoubtedly true that it is the duty of the court to give consideration to the opinion of the master, particularly where the veracity of the witnesses is involved. But even on such a question the court must exercise its judgment from an examination and consideration of the evidence, and is in no sense bound to adopt the finding of the master or to treat it as casting the burden on the party excepting to his report. In this case the burden was on the libelant, not because the master had found against him, but because it was there by operation of law from

the beginning to the end of the proceedings. A fortiori, where the master's findings of fact are not distinctly based upon his belief or disbelief of the witnesses, but upon a supposed policy of law affecting their credibility, the court is as well able as he to judge of the extent to which this supposed policy of law should be carried in determining their credibility. See Phillips' App., 68 Pa. 130. The pertinency of these observations is apparent. The learned master concluded his detailed recital of the testimony, not with a distinct finding that the facts testified to by libelant's witnesses were not sufficient to warrant the divorce (he could not have found that) nor with a finding that he disbelieved their testimony, but with this statement: "His reason, however, for recommending that the prayer of the libel be dismissed is based upon the fact that the testimony on which he is asked to make a finding in favor of the libelant and against respondent, consists mainly of the testimony of hired detectives." This was not a valid reason for refusing the divorce. There is no fixed rule of law or public policy which forbids the granting of a divorce upon the testimony of hired detectives. There are good reasons why such testimony should be scrutinized with great care, and according to dicta in textbooks and decisions it should be regarded with suspicion. The nature of the occupation and the interest which the hired detective has, arising out of his natural desire to please his employer, are reasons why a conscientious and prudent judge will scrutinize his testimony with great care before making it the basis of a decree dissolving the marriage tie. But if by reason of its volume, its clear, distinct and positive nature, the harmony of each of its parts with the others, and its harmony as a whole with the other facts in the case, the testimony induces an abiding conviction of its truth, it is impossible to see why the court should not act upon it. It has been said in some jurisdictions to require corroboration, but as said by Prof. Wigmore: "This ought merely to be

a caution of common sense which would occur to any juror:" 3 Wigmore on Evidence, sec. 2066. A leading case upon the subject is Moller v. Moller, 115 N. Y. 456. The opinion in that case gives some countenance to the doctrine that there must be corroboration in this class of cases, but the case did not turn precisely upon that question. There, as here, there was ample corroboration. After referring to that subject, Judge EARL went on to say: "The consequences which follow a judgment of divorce are so serious and momentous that such a judgment should not be granted without the evidence which furnishes the basis therefor is, after very careful scrutiny, satisfactory and such as can command the confidence of a careful, prudent and cautious judge. But the illicit amours of faithless husbands and wives are usually clandestine, and their wicked paths are hidden from public observation; hence courts must not be duped, and they must take such evidence as the nature of the case permits, circumstantial, direct or positive, and bringing to bear upon it the experiences and observations of life, and thus weighing it with prudence and care, give effect to its just preponderance." This is the true principle. It does not permit the judgment of the court to be hampered by artificial rules which may or may not be valuable in the particular case. The principle was peculiarly applicable here, and was observed by the learned court below in its review of the testimony and in the conclusions it based thereon. In our consideration of the case we have not gone upon the theory that its findings of fact are conclusive, but on the principle enunciated at the outset of this opinion. After full consideration of the testimony we are led to the same conclusion as that reached by the court below. If the testimony of the three detectives and Clem be believed, there can be no reasonable doubt that the charge made in the libel is established. It is not important to discuss the question whether the presumption of adultery arising from the conduct testified to by

them is a presumption of law or a presumption of fact. In view of the corroborations furnished by the admitted indiscretions of the respondent and O'Bryan, the letters put in evidence, and the correspondence between the handwriting of O'Bryan on the hotel register with the handwriting of the letters he wrote to the respondent, we are irresistibly led to the conclusion which the court reached. The opinion filed by the court so fully covers the ground that we do not deem it necessary to go into a detailed recital of the facts. In our judgment it meets the substantial questions raised in the argument of appellant's counsel in a full, adequate and satisfactory manner.

After the opinion of the court concluding that the allegations of the libel were sustained and the libelant was entitled to a divorce, and directing final rule for divorce to issue was filed and the rule was issued and served, the respondent, through her counsel, obtained a rule to show cause why the libelant should not pay an additional counsel fee and an amount to cover the expenses and costs incurred by her in making her defense. An answer was filed by the libelant. On the day the rule for divorce was made absolute and decree of divorce awarded, the court made this order: "May 1, 1914, rule absolute for additional counsel fee of $200 and discharged as to residue of said rule. Stay of proceedings is vacated." This order is the subject of the sixth assignment of error, it being contended that the amount awarded was inadequate. Clearly it was inadequate if the amount to be awarded, in addition to the $135 allowed by previous orders, was to be determined by the rule that would govern in an action by attorney against client. But the value of the attorney's services was not the only thing the court was bound to consider. The libelant was a second lieutenant in the United States Army, having a salary of $216 per month, subject to his necessary expenses, which were considerable. He asserted in his answer that he had paid all the costs of this proceeding, including the master's and stenographer's

charges, and the expense of taking testimony on behalf of the respondent, as well as his own behalf, in Newark and New York; also that he had been put to great expense in prosecuting his suit and had been obliged to incur indebtedness which he was unable at this time to pay. Moreover, early in the proceedings he was ordered to pay to the respondent $40.00 per month, as alimony pendente lite. In Waldron v. Waldron, 55 Pa. 231, the court said: "It is undoubtedly the duty of the court to make a proper allowance to the wife, if she be not herself of sufficient ability, to enable her to maintain or defend her suit, having regard to the ability of her husband; and it never fails to do so. But this is entirely within the discretion of the court, both as to amount and duration, and not subject to review." The same principle was announced in the earlier case of Breinig v. Breinig, 26 Pa. 161, and in the later cases of Fernald v. Fernald, 5 Pa. Superior Ct. 629, and Rieder v. Rieder, 21 Pa. Superior Ct. 482. Powers' App., 120 Pa. 320, and Biddle v. Biddle, 50 Pa. Superior Ct. 43, sustain the proposition that for a plain abuse of discretion the appellate court will reverse, but the cases go no further. When the nature and result of the main proceeding, the aggregate amount allowed for expenses and alimony pendente lite, and the ability of the respondent are considered, we cannot say that the court plainly abused its discretion in not awarding a larger sum. It is asserted by appellant's counsel that the libelant has not paid, and persistently refuses to pay the additional counsel fee of $200. If that be true, the court below has power, and it will be its duty, to enforce the order.

The assignments of error are overruled, and the decree of divorce is affirmed. The order of May 1, 1914, for additional counsel fee is also affirmed, and the record is remitted with direction to enforce it if it has been not complied with already. It is further ordered that each party pay his and her own costs incurred on this appeal.