## Klair v. Klair.

*Divorce—Report of master—Duty of court—Evidence—Adultery—Detectives—Attorney for libellant—Condonation—Collusion.*

1. The report of a master in divorce should contain: First, a definite finding of facts; second, the conclusions of law drawn by the master from the facts so ascertained. Discussion of the testimony heard before the master, without stating definitely what facts are found from that testimony, can hardly be said to be a finding of fact.

2. A recital of the testimony taken by a master in divorce comes more properly under the head of discussion. Findings of fact should be clear, precise and explicit.

3. The report of a master in divorce is merely advisory to the court, which it may accept and act upon or disregard, in whole or in part, according to its judgment as to the weight of the evidence or his legal conclusions.

4. While it is the duty of the court to give consideration to the opinion of a master in divorce, particularly where the veracity of witnesses is involved, even then the court must exercise its own judgment from an examination of the evidence, and is in no sense bound to adopt the finding of the master or treat it as casting the burden on the party excepting to his report.

5. In proceedings for divorce on the ground of adultery, the fact to be established should be proved, as in other cases, either by direct or circumstantial evidence. Where the fact to be proved is adultery, which can seldom be established by positive evidence, a *prima facie* case may be made out by showing circumstances which lead fairly and necessarily to the conclusion of adulterous practices as alleged in the libel.

6. While the proof of adultery in a divorce case is not required to be of the high character insisted upon in a criminal case, yet the evidence of adultery must be satisfactory.

7. Mere admissions or declarations, unsupported by other proof or corroborating circumstances, are not sufficient to justify a decree of divorce on the ground of adultery.

8. Evidence of detectives in a divorce case should be scrutinized with great care. A detective is a competent witness, and his testimony cannot be dismissed as altogether unworthy of consideration because of the nature of his business. If by reason of such testimony, its volume, its clear, distinct and positive nature, the harmony of each of its parts with the other and with other facts in the case, it induces an abiding conviction of truth, then it is to have the same weight as the testimony of other witnesses.

9. A divorce will not be granted upon the uncorroborated testimony of counsel for libellant, nor upon the testimony of hired detectives, unless that testimony appears to be reasonable in all respects, is clear, distinct and positive and in harmony with itself and other facts in the case.

10. A divorce will not be granted on the ground of adultery when the evidence as to adultery is equally balanced. There must be satisfactory proof to overcome the presumption of innocence.

11. In offering to pay the expenses of obtaining his wife's divorce and actually paying the same, a husband only does what a court would require him to do upon petition presented. This is not collusion.

12. Collusion is an agreement between husband and wife that one of them shall commit, or appear to commit, a breach of matrimonial duty in order that the other may obtain a divorce as for a real injury, or an agreement between them that a proceeding for divorce instituted by one of them shall not be resisted by the other.

13. The fact that a respondent appears and contests a divorce rebuts evidence of collusion.

Exceptions to report of master in divorce. C. P. Dauphin Co., June T., 1922, No. 463.

*Robert Stucker,* for libellant; *James K. Jackson,* for respondent.

WICKERSHAM, J., Jan. 2, 1923.—The reasons alleged for the divorce are cruel and barbarous treatment and indignities to the persons of the libellant, also "that the said respondent, Samuel S. Klair, hath given himself up to adulterous practices and hath committed adultery with one . . . at the City

of Harrisburg, Pennsylvania, and with divers other persons at divers times and places."

The subpœna issued in this case was served personally on the respondent, whereupon, on certificate of counsel for the libellant, the court appointed George V. Hoover, Esq., master. Having performed his duties as required by law and the rules of this court, the master presented his report, together with the testimony taken by him, on Nov. 6, 1922, in which he found, *inter alia*, the following facts:

That the respondent did commit adultery with the co-respondent; that there was no collusion between the husband and wife; that the offence was not condoned; and recommended "that the prayer of the libel be granted and a decree be made in accordance therewith."

Exceptions to the master's conclusions of fact and law were filed by the respondent, and are in effect that the master erred in finding from the testimony that the respondent committed adultery with the co-respondent; and he erred in his finding as a conclusion of law that the complaint of the libel was made by collusion between the husband and wife, and that he erred in recommending that the prayer of the libel be granted and that a decree be made in accordance therewith; whereupon the case was placed on the argument list and heard at length by the court.

The master prepared and submitted to the court a report which, in subject-matter and preparation, indicates patient, painstaking care and intelligence. We have only to suggest with respect thereto that the report of a master in divorce ought to contain, first, a definite finding of the facts; and, second, the conclusions of law drawn by the master from the facts so ascertained. Discussion of the testimony heard before the master, without stating definitely what facts the master finds from a consideration of that testimony, can hardly be said to be a "finding of fact." The court is left in doubt as to whether the master believed the testimony; and, if he believed it, what conclusion he reached from a consideration of it. A recital of the testimony of the witnesses heard by him would come more properly under the head of "discussion," whereas the finding of facts should be clear, concise and explicit.

Ever since the passage of the Act of 1815, it has been held to be incumbent upon the court to review the testimony and determine whether it sustains the complaint of the libellant, except in cases where there was an issue and a jury trial. We are called on to give careful consideration to the evidence to ascertain whether it is sufficient to establish the statutory grounds for a divorce, and this for the reason that divorces ought not to be easily obtained, and the married relation ought never be dissolved, without clear proof of imperious reasons. A report of the examiner does not carry with it the presumption of correctness which arises in a case of the findings of an auditor or master in an equitable proceeding. We must, therefore, examine the evidence with reference to its bearing on the averments of the complaint as set forth in the libel. The whole legislation on the subject clearly intends that the court shall not shift the duty of finding the facts to an appointee; whether the marital contract shall be severed is the gravest of questions, not alone to the parties, but to the State, for the social structure rests upon it. It never was intended that judicial function should in any material degree be relinquished by conducting the proceedings before a master in his office, or that weighty judicial responsibility should be evaded by shifting it over to a member of the bar: Middleton v. Middleton, 187 Pa. 612; Heimer v. Heimer, 63 Pa. Superior Ct. 476; Biddle v. Biddle, 50 Pa. Superior Ct. 30; Richards v. Richards, 37 Pa. 225; Edgar v. Edgar, 23 Pa. Superior Ct. 220.

3 D. & C.

Klair *v.* Klair.

The report of the master is merely advisory to the court, which it may accept and act upon or disregard in whole or in part, according to its judgment, as to the weight of the evidence or his legal conclusions: Edgar *v.* Edgar, 23 Pa. Superior Ct. 220. While it is true that it is the duty of the court to give consideration to the opinion of a master in divorce, particularly where the veracity of the witnesses is involved, even then the court must exercise its judgment from an examination and consideration of the evidence, and is in no sense bound to adopt the finding of the master or to treat it as casting the burden on the party excepting to his report: Naylor *v.* Naylor, 59 Pa. Superior Ct. 547, 559, *et seq.*

Guided and governed by the above principles coming down to us from the highest judicial authorities of the State, we have examined with great care the testimony taken by the master and filed with his report in this case, from which we find the following

## *Facts.*

1. The libellant and respondent are citizens of the Commonwealth of Pennsylvania, and have resided in the City of Harrisburg, Dauphin County, for a period of more than one year prior to the filing of the libel in divorce.

2. The libellant and respondent were lawfully joined in marriage Aug. 14, 1910.

3. July 12, 1922, the libellant, through her attorney, by letter, notified the respondent that she had decided to make application for a divorce and would expect him to pay counsel fees and expenses incident to the trial of the case, further requesting him to advise "if you will do this in an amicable way, otherwise we will petition the Court of Common Pleas of Dauphin County for a rule on you to show cause why you should not pay same."

4. The libel in divorce on the respondent was presented to the court and a subpœna awarded July 17, 1922.

5. A few days prior to the filing of the libel in divorce and the issuing of a subpœna thereon, she, the libellant, called upon the respondent at his lodging-house, No. 120 South Second Street, in the City of Harrisburg, and found in his bureau drawer a lady's hairnet and several ladies' handkerchiefs.

6. The next evening she again called at the home of the respondent and found him coming out of the room of Jeanette Blamer, the co-respondent, who occupied the room across the hall from that occupied by the respondent. This was about 7 o'clock in the evening.

7. Jeanette Blamer, the co-respondent, was a working girl employed from time to time at various places in the City of Harrisburg. When not otherwise engaged, she cooked and served meals to various persons in her room, for which she charged the sum of 50 cents. The libellant frequently took his evening meal there, and on the occasion above referred to he had taken his supper in the room of her, the said Jeanette Blamer.

8. Mr. Paul, the owner of the building, and other occupants and tenants of said building also from to time took meals in Jeanette Blamer's room, for which they paid to her the sum of 50 cents.

9. Mr. Paul, the owner of the building in which the respondent and co-respondent and others roomed, and other occupants of the said house at No. 120 South Second Street who testified, never saw any improper conduct between the respondent and the co-respondent, Jeanette Blamer.

10. When counsel for libellant was notified by the libellant of the occurrence mentioned in finding No. 6, he directed Detective Durnbaugh, of Harrisburg, to go to house No. 120 South Second Street and investigate.

11. Detective Durnbaugh and his manager immediately went to said house and found in Mrs. Blamer's room Jeanette Blamer, Mrs. Klair, the libellant, Mr. Klair, the respondent, her husband, and their young daughter. In the room he also found a table set for two, where Klair had recently eaten his evening meal.

12. After conferring with the attorney for libellant, Detective Durnbaugh and his manager brought all of the parties to said attorney's office, where the relationship between Klair, the respondent, and Jeanette Blamer was discussed.

13. We are not able to find from the testimony, most contradictory in its nature, that any statements were made at this meeting which would amount to a confession of improper criminal conduct between the respondent and Jeanette Blamer.

14. We find no satisfactory evidence in this case sufficient to lead to the conclusion that the respondent committed adultery with Jeanette Blamer, nor do we find any such evidence that he committed adultery with Lillian Logan or Mary Skiles or Mrs. Harbaker. Even if there was such evidence as to the three last named women, the infidelity of the respondent was condoned by the libellant.

## Discussion.

The libellant endeavors to establish her allegations that her husband committed adultery with Jeanette Blamer, first, by testifying to suspicious circumstances, indicating an immoral relation between the two; and, secondly, by offering testimony of a confession or admission of guilt made by the respondent and Jeanette Blamer at the time she discovered her husband coming out of Mrs. Blamer's room, repeated at the interview between the parties and the detectives in said room, and again repeated a short time afterwards in the office of libellant's attorney.

The suspicious circumstances were, first, that a woman's hairnet and handkerchiefs were found in her husband's bureau drawer in his room. The respondent admits these articles were there, but testified that he found the hairnet on the streets of the City of Harrisburg, and that handkerchiefs from time to time were left in one or the other of the automobiles of Mr. Kauffman, for whom the respondent was chauffeur, by ladies whom he had out driving in said automobiles; that he had the handkerchiefs laundered and kept them in his bureau drawer.

Second, that she visited her husband the evening after the hairnet and handkerchiefs were found at his rooming-house, No. 120 South Second Street, about 7 o'clock in the evening, and found him coming out of Mrs. Blamer's room. The respondent explains this incident by testifying that Mrs. Blamer served meals in her room to himself and other tenants of said house, also to Mr. Paul, the owner of the building, for which she charged 50 cents; that he was in the habit of eating his meals with her, for which he paid her regularly the sum of 50 cents, and that on the evening when his wife saw him coming out of her room he had just finished his supper. It also appeared from the evidence that Klair sometimes played cards in the room of Mrs. Blamer, but always in company with others, usually roomers in the same building.

Third, when Jeanette Blamer lived with Mrs. Kohlson, just opposite the garage where the respondent worked, she frequently went to the garage to see him; but it also appeared that the garage door was open, and Jeanette Blamer and many others went there to use the telephone.

In proceedings for divorce on the ground of adultery, the fact to be established should be proved, as in other cases, either by direct or circumstantial

3 D. & C.

evidence. Where the fact to be proved is that of adultery, which can seldom be established by positive evidence, a *prima facie* case may be made out by showing circumstances which lead fairly and necessarily to the conclusion of adulterous practices as alleged in the libel: Garr *v.* Garr, 19 Pa. C. C. Reps. 502.

We do not think the inference that the respondent and Jeanette Blamer committed adultery can be fairly and reasonably deduced from the testimony in this branch of the case. The circumstances, suspicious as they may appear, seem to be satisfactorily explained. If this case had been tried in the Court of Quarter Sessions, we would hesitate to submit the guilt of the defendant to a jury on such unsatisfactory evidence, and if we did so and the jury returned a verdict of guilty, we would not feel justified in sustaining a conviction. While in a criminal case the jury must be satisfied beyond a reasonable doubt that the defendant is guilty, and while it is true that the proof of guilt of adultery is not required to be of that high character in a divorce case which is insisted upon in a criminal case, yet the evidence of adultery must be satisfactory. We cannot, therefore, reach the conclusion that the evidence of suspicious circumstances, indicating adultery upon the part of the respondent, has been sufficiently satisfactory to move the court to grant a divorce on that ground.

The second basis upon which the libellant rests her case is that, on her second visit to her husband's room, she found him, about 7 o'clock in the evening, coming out of the room of the co-respondent, Jeanette Blamer, that she then and there accused them of adulterous practices, which they admitted, which practices they also admitted in the hearing and presence of the detectives and afterwards in the hearing and presence of the same parties in her attorney's office. We will now proceed to examine the evidence and draw from it the conclusions which it merits.

We can best get an understanding of the contention of the libellant by quoting from her testimony at the first hearing of this case, as found in Notes of Testimony, page 7, and relating to her second visit to her husband's rooming-house:

"Q. And what occurred then? A. I opened the door back, and I said, 'After what you have promised me to do (that was when he promised to do what was right if I would take him back) ; after what you have promised to do, I come down and find this.' . . . Q. Then, what did he say? A. He got me over in his room and told me he was only taking his meals with this woman because his ankle was hurt, and that there wasn't anything between them, and said that if I would just give him a chance we would go away together, he and I; then we were sitting there a while and this woman called Sam (Mr. Klair) and asked him if he had her bank book. He said he had not. Then she called again and came to the room door, and he said, 'Jean, I do not have your bank book,' and she said, 'You do have my bank book and all my money, and you broke my heart.' I said, 'You are the Jean that lived with Mrs. Kohlson.' She said, 'Yes, Mrs. Klair, I am, and Sam broke my heart.' I then said, 'You knew he was married,' and she said, 'Not at first.' Q. Then what? A. I said, 'Was this all planned out, that you and Sam were to live together down here,' and she said it was, and she told me about nasty things he told her about him and why he left home. . . . Q. What did you do then when you found this situation? A. That's when I called you on the 'phone. Q. And what did you want me to do when you called me? A. I wanted you to come down and then you sent Mr. Durnbaugh. Q. He was sent down by me because I, as a lawyer, did not want to come down? A. Yes. Q. Then what happened? What did

you do then? Did you come to my office? A. Yes; that when we came to your office. Q. Who came to my office? A'. Sam (Mr. Klair), Jean, Mr. Durnbaugh, Mr. Thomy, Rebecca and myself. . . . Q. What did your husband and this Jean say then, if you recall? A. They admitted that they were living together as man and wife, and her room was used as a kitchen. (Notes of Testimony, page 8.) . . . A. She told him (my husband) if he came back home with me he would be sorry—that she would make him suffer."

Mr. Durnbaugh, the detective, testifying as to the same event, said—see Notes of Testimony, page 11: "This lady (meaning Mrs. Klair) opened the door from the kitchen and she said, 'Are you the man Mr. Stucker sent here? Will you come in?' I went in and found the table set for two places; somebody had been eating, and she says to me, 'This is my husband.' Q. Mrs. Klair said that? A. Yes. 'I said what are you doing with this woman, and she said'— Q. Mrs. Klair said? A. Yes, Mrs. Klair said 'He is living with this woman.' Well, I said, 'Are you living with this woman,' and he says, 'Yes, I am living with her,' and I says, 'Well, now this is your wife. You shouldn't be living with this other woman,' and I said, 'I have the car down here; we will go up to Mr. Stucker's office to see Mr. Stucker.' I called him up; he was there, and I said, 'We will go up to Mr. Stucker's office and see what's doing.' She got in, this other lady and her husband got in; I then got in and her child, and went up to Mr. Stucker's office, and then we questioned him in regard to living down there with this woman and cohabiting with her, and he admitted, right in the office, that they had been living together as man and wife. He says, 'I am in the wrong.' He admitted living as man and wife and he was cohabiting with this woman at the time."

The detective also testified that Mrs. Blamer admitted the same thing. He testified: "Mr. Stucker had asked her and she admitted all this, that they had been living together as man and wife." (Notes of Testimony, page 11.)

On page 12, Detective Durnbaugh testified, speaking of the respondent, Mr. Klair: "He says, 'You are not going to prosecute me or put me to jail, are you?' I told him, 'I don't know anything at all about that,' and Mr. Stucker told him, no, there would be no jail in this, and there would be no prosecution."

Mr. Thomy, the manager of Mr. Durnbaugh, detective, testified to practically the same thing—see Notes of Testimony, page 13.

This testimony, standing alone and without other corroboration, would not be sufficient basis for the granting of a divorce on the ground of adultery. A confession is only evidence which may be contradicted or disbelieved: Pomeroy v. Pomeroy, 26 Pa. C. C. Reps. 575. It is not sufficient that the court should be morally convinced of the guilt of the defendant; it must be satisfied that such conviction is founded on legal evidence applicable to legal charges: Per Drew, J., in Wichert v. Wichert, 68 Pitts. L. J. 362. Mere admissions or declarations, unsupported by any other proof or by corroborating circumstances, are not sufficient to justify a decree of divorce on the ground of adultery: Quick v. Quick, 6 Luzerne Legal Reg. 137. In a divorce case, evidence of the confession of the defendant, especially when given only by the oath of the plaintiff, is of no value without proof of corroborating circumstances. Conduct showing a coarse manner of life is not sufficient corroboration of such evidence of confession of adultery: Per Lowrie, P. J., in Edwards v. Edwards, 3 Pitts. Reps. 333. The danger of accepting evidence of this kind as conclusive is there would be no restraint upon collusion if it should be allowed: Hake v. Fink, 9 Watts, 336, per Gibson, C. J. It is held in a number of Common Pleas Court decisions that imprudent acts, improper

3 D. & C.

decorum, unseemly attitude, flippant bearing are not in themselves sufficient to show criminal conduct which would justify a rupture of the marital bond on the ground of adultery: Per Shull, P. J., in McCune v. McCune, 31 Pa. Superior Ct. 248. A divorce will not be granted on the ground of adultery when the testimony on behalf of the libellant proves nothing except the declarations and admissions of the respondent regarding his adultery with another woman which are not supported by any sufficient or proper corroborating circumstances. Such evidence proves nothing except the declarations and admissions of the respondent, and in this case of the co-respondent, which may or may not be true: Per Frazer, J., in Ritchey v. Ritchey, 27 Pitts. L. J. (N. S.) 434-435. In this case Judge Frazer indicates that the surrounding circumstances may become important, and we will proceed to consider what the surrounding circumstances were.

The evidence shows the respondent to be a workingman, the chauffeur for Mr. Kauffman. It also shows him to be unfamiliar with detectives, officers and lawyers, and having wholesome fear of them. The co-respondent—not named in the libel in divorce, but brought into the case through the evidence—is a working girl, employed at divers places in the City of Harrisburg, who also augments her income and aids in supplying her living expenses by cooking meals and serving them in her room in the apartment-house of Mr. Paul, No. 120 South Second Street, in the City of Harrisburg. She also is unfamiliar with the ways of detectives, officers and lawyers. We have also in this case a jealous wife, evidently seeking information to aid her in securing a divorce. After being separated some time from her husband, and after notifying him, through her attorney, that she contemplates divorce proceedings, she visits him at his apartment. She testified that she went to see him because she heard he was injured and might need her assistance; but, immediately upon entering his room, she first investigated his bureau drawers, where she found the lady's hairnet and handkerchiefs, and then attempted to examine his wardrobe and closet. Why? Was she seeking for evidence to support her divorce proceedings? The next evening she again went to his room with her little daughter. She testified she went there to have her husband take them out to dinner; but she did not arrive until after the dinner hour, at least after the time when working people eat their evening meal, to wit, after 7 o'clock in the evening. She found her husband coming out of the room of the co-respondent, where he had eaten his supper and for which, the uncontradicted testimony is, he paid. She then testified that Mrs. Blamer made the admissions which we have quoted in an early part of this discussion. That Mrs. Blamer should sit down with the wife of the respondent and make the statements to which Mrs. Klair testified taxes our credulity. It is unnatural, unreal and incomprehensible that she should do so. The only theory in support of the reasonableness of such testimony is that she and Klair were endeavoring to create a situation which would enable Mrs. Klair to obtain a divorce from her husband; but this theory is untenable when we consider the denial of Mrs. Blamer and the respondent.

Having the stage properly set, we find Mrs. Klair, the libellant, calling her lawyer and asking him to come down and see for himself. Of course, he refused to go, but he sent two detectives down to look the situation over. We have quoted from their testimony as found on page 10, et seq., of the Notes of Testimony, and we find they were recalled and practically repeated the same testimony—see pages 96 and 97, et seq.

The evidence of detectives in cases of this sort is to be scrutinized with great care. A detective is a competent witness and his testimony must be consid-

ered, and it cannot be dismissed altogether as unworthy of consideration because of the nature of his business. If, by reason of such testimony, of its volume, its clear, distinct and positive nature, the harmony of each of its parts with the other, and of its harmony as a whole with the other facts in the case, it induces an abiding conviction of truth, then it is to have the same weight as the testimony of other witnesses: Naylor v. Naylor, 59 Pa. Superior Ct. 547; Blind v. Blind, 71 Pa. Superior Ct. 396.

The substance of the testimony of the two detectives was—see Notes of Testimony, page 11—that when Detective Durnbaugh entered the room where all the parties were, at No. 120 South Second Street, Mrs. Klair, the libellant, said, "He is living with this woman," and the detective said to Klair, "Are you living with this woman?" and he said, "Yes, I am living with her," and the detective said, "Well, now, this is your wife; you shouldn't be living with this other woman." In effect this testimony is corroborated by his manager, Detective Thomy—see Notes of Testimony, page 13. After conferring over the telephone with libellant's attorney, Durnbaugh testified that he was directed by him to bring all the parties to his office, and this was done. There the detective testified—see Notes of Testimony, page 11—"We questioned him in regard to living down there with this woman and cohabiting with her, and he admitted, right in the office, that they had been living together as man and wife." This testimony may be qualified by what the officer continued to testify: "He says I am in wrong." This testimony loses much of its weight because the statement "he admitted" is a legal conclusion. He does not state what the witness himself said. With regard to Mrs. Blamer, the detective testified: "There was no threat made and she admitted at the same time— Mr. Stucker had asked her and she admitted all those things, that they had been living together as man and wife." Detective Thomy said, in answer to Mr. Stucker's question, "What occurred in my office, if you recall? A. Mr. Klair admitted then of living with this lady." Turning now to page 96 of the Notes of Testimony, where Mr. Durnbaugh was recalled, it appeared that Mr. Klair was required to pay $5 to the detective for going to Klair's room, making the inquiry and brining the parties to Mr. Stucker's office. The detective testified, "He said he was in wrong and he was caught, and he admitted he had carnal knowledge of this woman." No reference is made to the matter of having carnal knowledge at the first hearing, and the detective further testified that he told Klair he was lucky that there wasn't a prosecution right there. It is rather a significant fact that, in recalling the testimony given at the first hearing—see Notes of Testimony, page 97—the detective said, "I went in and asked them 'What's the trouble?' She said she caught him in this room, and then, after we had talked some time and I couldn't decide this and I didn't know what to do, so I called you (Mr. Stucker) up and asked what to do. You said, bring them up to the office, and they all willingly went up to the office." In passing upon the credibility of this witness, we cannot overlook the fact that the testimony he gave at the second hearing, found in Notes of Testimony, page 97, differs very materially from the testimony he gave at the first hearing of this case, when the respondent was not present to confront him. And Thomy, being recalled, stated that when he came into the room at No. 120 South Second Street, "They were wrangling, and Mr. Durnbaugh went out to 'phone and came back and said the best thing we can do is to go up to Mr. Stucker's office. . . . Just go up there for an understanding." When they got to the office, this detective testified, "He admitted he was in wrong," and at another time, "You have got the goods on me"— Notes of Testimony, page 98. And, again, "He admitted he had carnal knowl-

3 D. & C.

edge of this Jean. You asked Jean if that was right, and she said, 'Yes.' "—
Notes of Testimony, pages 98 and 99.

Attorney Stucker also took the witness-stand, was sworn and testified. We pass by the ethical question of the propriety of having these parties brought to the office of the attorney of the libellant and there questioned, and the attorney for the libellant taking the witness-stand to prove what they said. He stated—see Notes of Testimony, page 91—"It was not necessary to have them prosecuted. They acknowledged and they admitted everything, and I was there to protect them." "They acknowledged and they admitted" are legal conclusions. The counselor did not attempt to say what they said, nor do we understand what he meant by saying "he was there to protect them," as he was attorney for the libellant in this case. He further says he was trying to keep things quiet because Mr. Durnbaugh acted in the way he did and didn't arrest them. Again, he says, "Klair admitted everything," without attempting to say what Klair said. He then goes on to testify that subsequently Klair called at his office at least four times and hauled the attorney around in his automobile. "His one thought was a reconciliation with his wife, and I had it fixed up and I put the proposition to him that he was not in a position to have a reconciliation until he would abandon this woman." He then goes on to testify as to what Klair said to him in these confidential communications. It does not seem to us that we should give any weight or consideration to the testimony as to what occurred between Mr. Stucker and Mr. Klair on these four occasions when Klair was present, endeavoring to bring about a reconciliation with his wife. It seems to be taking a very unfair advantage of the respondent, in a suit in which counsel represented the libellant, for him to receive such communications in an effort, as was claimed, to bring these parties together and effect a reconciliation, and then to testify as to those statements in adversary proceedings such as this. Standing alone, uncontradicted, all of the testimony given might be sufficient to merit the granting of a divorce in this case; but we must not overlook the fact of the very positive contradiction of these damaging statements by the respondent and by Mrs. Blamer. In speaking about his relations with Mrs. Blamer, Klair testified—see Notes of Testimony, page 57—in answer to the question put by Mr. Stucker, "Don't you want this divorce to be granted now?" A. "She can have her divorce, Mr. Stucker; I am protesting on the grounds of adultery. I don't know any more about that woman, if she is a woman or a man." Examined as to the statements she made to Mrs. Klair, Mrs. Blamer said—see Notes of Testimony, page 99—Question by Mr. Jackson: "What, if anything, did you say to Mrs. Klair? A. I didn't say anything to Mrs. Klair. Q. She testified that you said you were the Jean who lived at Mrs. Kohlson's, and that Sam had broken your heart. A. I didn't say Sam had broken my heart. Q. Do you remember saying anything to her? A. She asked me if I was the Jean at Mrs. Kohlson's; I said I was. Q. Was that all? A. That's all."

Samuel Klair, examined as to what he said in Mr. Stucker's office—see Notes of Testimony, page 101—testified: "The only thing I says in Mr. Stucker's office was that if I was in wrong, I will have to pay it, because I didn't know any better, or that it was to get it on the grounds of infidelity. I thought probably if they could go in a room and see you in there, they could get the divorce on the grounds of infidelity. I said about being in wrong. I meant that the way I thought. I didn't know any better. I said, 'If I am in wrong, I will just have to pay for it.'" On page 40 of the Notes of Testimony, Klair, the respondent, testified, in answer to the question, "It has been

testified in this case that you and Mrs. Blamer, in the evening in which you were in Mr. Stucker's office, admitted that you had been living together at No. 120 South Second Street as man and wife. Is that true.? A. No, sir; I did not. Q. Did you make such admission? A. No, sir; I did not. Q. Did you make any admissions of that nature? A. No, sir; I did not. Q. What, if anything, did you say? A. They accused me of it. I said the only thing I do there is go in there to get my meals." And on page 41 he testified: "Q. Did you hear what Mrs. Blamer said? A. I did not hear anything Mrs. Blamer said. If I am not mistaken, Mrs. Blamer did not say a word." Again, we find the following: "Q. Mr. Durnbaugh testified at the previous hearing of this case that 'we questioned him in regard to living down there with this woman and cohabiting with her, and he admitted, right in the office, that they had been living together as man and wife. He says, 'I am in the wrong.' He admitted living as man and wife and that he was cohabiting with this woman at the time.' Is that true? A. No, sir; I did not. Q. Did you say anything like that? A. No, sir. The only thing I said was that I was taking my meals there, and there wasn't anything else"—see Notes of Testimony, page 41. Again, "Mr. Thomy testified at the previous hearing in this case to the same effect, that you admitted living with Mrs. Blamer as man and wife? A. I did not. Q. Have you ever lived with this woman as man and wife? A. No, sir; I did not. Q. At any time since July of this year? A. No, sir. Q. Since the time you came to live in that house? A. No, sir; I never did. Q. Since the last time that you separated from your wife? A. No, sir; I never did."—Notes of Testimony, page 42.

Mrs. Blamer, in her testimony—see Notes, beginning at page 65—explains what Klair was doing in her room, to wit, taking his evening meal. Questioned as to what was said in Mr. Stucker's office—see Notes of Testimony, page 66—the witness testified: "A. Mrs. Klair said to Mr. Stucker that she had come down with the intention of taking Mr. Klair back home to live together, and since she had come down and seen Mr. Klair in my room, she wouldn't have him back any more. All she wanted was a divorce, and she was going to get it. She was going to pay for the divorce herself, but, after she had seen Mr. Klair in my room, she said he would pay for it, and Mr. Stucker said he thought the best thing to do for Mr. Klair was to pay for the divorce, and Mr. Durnbaugh said to Sam that he thought Mrs. Klair was leaving him off very easy by just paying for the divorce." Again, on page 67, the witness testified: "Q. It has been testified that Mr. Klair made certain admissions, and that you made certain admissions, in Mr. Stucker's office. What do you recall about that? A. I made no admissions whatever. There was no questions asked me and I said nothing. As far as Mr. Klair making admissions, I heard nothing, but if he was supposed to pay for this divorce, he would pay for it. Q. Did you hear any questions asked him as to what he was doing at No. 120 South Second Street, or anything of that sort? A. I don't just exactly recall that some one asked him that, but Mr. Stucker or Mr. Durnbaugh. Q. Did any one ask you any questions about what you were doing? A. No, sir. Q. Did you voluntarily say anything about that? A. I did not."—Notes of Testimony, pages 67 and 68. In cross-examination, the witness testified: "Was it not asked you in my office under what circumstances you met Klair, and you said you met him first as a single man? A. No, sir. Q. Nothing of that kind? A. No, sir."—Notes of Testimony, page 68.

It thus appears that all damaging testimony given by the libellant, the detectives and counsel is flatly and positively contradicted and denied by the

3 D. & C.

respondent and co-respondent. We would never establish the precedent in this county of granting a divorce upon the uncorroborated testimony of counsel for the libellant, nor would we ever grant a divorce on the testimony of hired detectives, unless that testimony appeared to be reasonable and in all respects met the requirements which we have above indicated. Is it likely, is it reasonable, is it true, that when the detectives sent by counsel for the libellant to the room in which the parties were found, they meekly and frankly admitted they were guilty of committing a serious offence which would subject them to the danger of prosecution, conviction and imprisonment? We cannot believe it. It is unreasonable, it is unnatural, and we believe it is not true. The same thing may be said, and we reach the same conclusion, with regard to the testimony of these detectives in the office of Mr. Stucker. As we have before stated, the only ground upon which such a statement is believable is that the respondent and the co-respondent were endeavoring to make testimony to aid the libellant in procuring her divorce; and if that were true, then certainly we would not grant a divorce upon such testimony. Considering the habits, the station in life of Klair and Jeanette Blamer, their conduct is more consistent with innocence than with guilt.

Nor does the testimony of Mrs. Kohlson contribute any light upon this case. We cannot agree with the master that she was an unwilling witness. She does not say so. It does not anywhere appear that she ordered Jeanette Blamer out of her house, or that she left because of comments Mrs. Kohlson made with regard to her going to the garage where Klair worked. Furthermore, it appears that there was a telephone in this garage, and that many of the people living on that street were in the habit of using it, including Mrs. Kohlson herself. When asked whether Mrs. Blamer left because of Mrs. Kohlson's criticism, her answer was, "I suppose that is the reason." At another place, when she was asked who Klair came to see at her house, her answer was, "I suppose Mrs. Blamer."—Notes of Testimony, page 82. We can give little weight to the testimony of a witness who "supposes," but does not know.

In a suit for divorce, more than equally balanced evidence must be adduced. There must be satisfactory proof to overcome the presumption of innocence: Blank v. Blank, 5 York Leg. Record, 67. In all cases when crime is imputed, the presumption of innocence prevails; and in proportion to the gravity of the charge and the rare occurrence of the crime imputed, it is reasonable to require more cogent evidence to overcome that presumption: 2 Bishop on Marriage and Divorce, § 278.

In the case of Thomas v. Thomas, 76 Pa. Superior Ct. 54, a libel in divorce on the ground of adultery was properly dismissed where the only evidence produced was to the effect that the respondent and another man were discovered together in the libellant's house at midnight, but the testimony did not justify a conclusion that the respondent and the person named were guilty of the offence charged in the libel.

It is also most significant that, although the respondent and Jeanette Blamer lived in the large apartment-house of Mr. Paul, at No. 120 South Second Street, occupied by many other tenants, no witness has been called from among said tenants to testify to any misconduct on their part. Can it be possible that they could be living in this building as husband and wife without that fact coming to the knowledge of other tenants of the building? We have already indicated in this opinion that the occupants of the building who testified saw nothing improper in the conduct of these parties.

We do not think the evidence of condonation is of any importance in this

Klair *v.* Klair.

case, because there does not appear to us, as we view the evidence, to be anything to condone. In any event, the testimony is equally balanced and not sufficiently satisfactory upon which to base a conclusion: Koch *v.* Koch, 62 Pa. Superior Ct. 607.

We do not find any evidence of collusion. In offering to pay the expenses of obtaining his wife's divorce and actually paying the same, the respondent only did what the court would have required him to do had a petition been presented to us. Collusion is an agreement between husband and wife, by one of them to commit, or appear to commit, a breach of the matrimonial duty in order that the other might obtain the legal remedy of divorce or separation as for a real injury; or an agreement between them that a proceeding for divorce instituted by the one shall not be resisted by the other: Loomis *v.* Loomis, 20 Dist. R. 731. Inasmuch as the respondent appeared and contested this divorce on the ground of adultery, that certainly rebuts all evidence of collusion.

The first and fourth exceptions to the master's report on the part of the respondent are sustained. The second and third exceptions are dismissed.

*Conclusions of law.*

1. The libellant is not entitled to a decree of divorce in this case.

From George R. Barnett, Harrisburg, Pa.