# Biddle *v.* Biddle, Appellant (No. 1).

*Divorce—Appeals—Duty of appellate court on appeal.*

1. On an appeal from a decree awarding a divorce, it is incumbent on the appellate court to review the testimony, and to determine whether it sustains the decree of the lower court, excepting cases where there is an issue and a jury trial; and it is all the more incumbent upon the appellate court to examine the testimony, where it appears that the decree of the court below is based upon a divided opinion of the judges of such court.

*Divorce—Cruel and barbarous treatment—Indignities to the person— Evidence.*

2. In a libel for divorce filed by the husband, it appeared that the libelant and his wife lived in a hospital where he was a resident surgeon. The libelant introduced evidence to show that his wife's bearing towards him was unkind; that she nagged him by calling him offensive names in the presence of the family and visitors, that she disparaged his ability as a surgeon and business man; that she interfered with his professional work at the hospital of which he had charge; that she made unseasonable requests for improvements in the hospital to the trustees; that she encouraged their daughter and two sons to be dis-

respectful towards him; that she declared that he was unfit for his place; and that she had asked members of the board of trustees to remove him from his position. Much of this testimony was contradicted, and much of the effect of it was weakened by the explanation of the wife's witnesses. It also appeared that the libelant constantly accused his wife without foundation, of infidelity. *Held,* that neither the charge of cruel and barbarous treatment nor indignities to the person were sufficiently established to justify the granting of a decree for divorce.

3. A complainant is not entitled to divorce where the indignities relied on are provoked by the complainant party unless the retaliation was excessive.

4. The conduct of a wife that will entitle her husband to a divorce for cruel and barbarous treatment, must be not only such as renders his condition intolerable or life burdensome, but such as amounts to cruel and barbarous treatment. Both of these statutory elements must concur.

5. Cruel·and barbarous treatment must be exhibited in a course of conduct. An occasional expression of anger, or the use of opprobrious epithets uttered in heated discussion, or comments on the husband's business ability, or criticism of his capacity to secure the best financial results from his professional skill, do not amount to cruel and barbarous treatment within the meaning of the statute.

Argued Dec. 5, 1911. Appeal, No. 000, Oct. T., 1912, by defendant, from decree of C. P. Schuylkill Co., May T., 1910, No. 156, refusing divorce in case of J. C. Biddle v. Agnes M. Biddle. Before RICE, P. J., HENDERSON, MORRISON, ORLADY, HEAD, BEAVER and PORTER, JJ. Reversed.

Libel for divorce. Before BECHTEL, J.

The facts are stated in the opinion of the Superior Court.

*Error assigned* was decree refusing divorce.

*William Wilhelm* and *John T. Lenahan,* with them *Frank J. Laubenstein* and *Daniel J. Ferguson,* for appellant.—It is not sufficient that the condition of the husband be rendered intolerable or his life burdensome; but it must be also shown that such conditions were produced by respondent's cruel and barbarous treatment. If by

any other means a husband's condition is rendered intolerable and his life burdensome, he is without remedy: Harris's App., 2 W. N. C. 331; Eshbach v. Eshbach, 23 Pa. 343; Richards v. Richards, 37 Pa. 225; Heilbron v. Heilbron, 158 Pa. 297; McMahen v. McMahen, 186 Pa. 485; Hahn v. Bealor, 132 Pa. 242.

*C. E. Berger,* with him *J. H. Fertig* and *J. W. Carpenter,* for appellee.—The following cases establish that a husband is entitled to a divorce for such cruel and barbarous treatment as renders his condition intolerable and life burdensome: Jones v. Jones, 66 Pa. 494; Heilbron v. Heilbron, 158 Pa. 297; Barnsdall v. Barnsdall, 171 Pa. 625; Fay v. Fay, 27 Pa. Superior Ct. 328; Shaw v. Shaw, 36 Pa. Superior Ct. 122; Russell v. Russell, 37 Pa. Superior Ct. 348; Hexamer v. Hexamer, 42 Pa. Superior Ct. 226; Krug v. Krug, 22 Pa. Superior Ct. 572.

OPINION BY HENDERSON, J., April 15, 1912:

The libel in this case as originally filed contained three causes of complaint, viz.: cruel and barbarous treatment, indignities to the person and adultery. The latter charge was stricken from the record November 14, 1910, on the petition of the libelant who represented to the court that it was inserted in the libel owing to a misunderstanding, misapprehension and misinformation in regard to certain facts and that for the reason that he misapprehended the facts and had been misinformed in regard thereto by information which he now believes to be untrue he desired the libel to be amended by striking therefrom the charge of adultery. Personal service of the subpœna was not had on the respondent, and after the return of the sheriff's proclamation an examiner was appointed to take testimony. The respondent was served with notice that testimony would be taken November 19 at the complainant's residence and at that time the testimony of two witnesses was taken, the respondent not being present nor represented by counsel. Two days later the report of the

examiner was filed recommending that a decree be entered in favor of the complainant. Thereupon, the respondent filed exceptions to the report and a petition praying the court to direct the master to reopen the hearing and allow further testimony bearing on the question of the right of the libelant to a divorce. This petition was granted and the case referred to the master to take further testimony and report thereon. After the taking of a large volume of testimony the examiner again recommended a decree in favor of the complainant. Exceptions were filed to the second report on which arguments were had in the court of common pleas. The opinion was filed in the office of the prothonotary on July 17, 1911, it having been forwarded from New Jersey where Judge BECHTEL, who wrote the opinion, was spending a portion of the summer. The other judges of the court were not advised that the opinion was prepared and was to be filed at that time. Four days later an appeal to the Superior Court was taken. Judge BRUMM having learned that the decree was entered filed a dissenting opinion on July 24 and on November 6 President Judge SHAY filed an opinion concurring in the decree. As Judge SHAY did not sit in the argument of the case nor examine the testimony, he states in his opinion that he does not propose to review the voluminous testimony in order to decide which one of his colleagues in his judgment reached the correct conclusion, but that he joins with Judge BECHTEL in the opinion filed by him "for the purpose of having the case decided by the higher court on its merits and not dismissed on a mere technicality," the technicality referred to being the objection that the opinion filed by Judge BECHTEL in vacation without the knowledge or consent of his colleagues would not have the effect of a decree of the court. It has been held by the Supreme Court ever since the passage of the act of 1815 to be incumbent on it to review the testimony and determine whether it sustained the complaint of the libelant on an appeal from a decree for a divorce, except in cases where there was an issue and a jury trial, and that

rule governs this court also in the consideration of cases
of this class. We are called on to give careful considera-
tion to the evidence to ascertain whether it is sufficient to
establish the statutory grounds for a divorce, and this for
the reason as was said in Richards v. Richards, 37 Pa. 225,
that divorces ought not to be easily obtained and the mar-
riage relation should never be dissolved without clear
proof of imperious reasons. The necessity for such a con-
sideration of the evidence is the more obvious in this case
by reason of the difference of opinion existing in the minds
of the judges of the court below. If it be taken for granted
that the opinion filed by Judge BECHTEL became a decree
of the court it is a fact that the only other judge of the
court who examined the case reached an entirely different
conclusion. A report of the examiner and the judgment
of the court do not carry with them the presumption of
correctness which arises in a case of the findings of an
auditor or master and the confirmation thereof by the
court below in an equitable proceeding. We must there-
fore examine the evidence with reference to its bearing on
the averments of the complainant as set forth in his libel.
In support of his case the libelant introduced evidence to
show that his wife's bearing toward him was unkind; that
she nagged him by calling him offensive names in the
presence of the family and visitors; that she disparaged
his ability as a surgeon and business man; that she inter-
fered with his professional work at the hospital of which
he had charge; that she made unseasonable requests for
improvements in the hospital to the trustees; that she
encouraged their daughter and two sons to be disrespect-
ful toward him; that she declared he was unfit for his
place and that she asked members of the board of trustees
to remove him from his position. The principal evidence
in support of the case was given by the complainant, two
physicians who had been for a time at the hospital and
two members of the board of trustees. Other members of
the board gave testimony, but their evidence was not of
matters bearing directly on the charges set forth. On the

subject of the respondent's bearing toward the complainant, Dr. Davies testified, "She on a great many times assumed an attitude of ridicule toward him by making frequent sneering remarks. . . . I have heard her call him a baldhead; I have heard her call him a graybeard; I have heard her call him a lunkhead; I have heard her call him a hypocrite; I have heard her say he must be crazy. Q. What statement if any did she make reflecting upon his moral character?  A. Well, frequently by innuendo. Q. Be as specific as you can; what language did she employ to convey that?  A. Twitting him of intimacy with the nurses in the back part of the house."  Dr. Reese said, "She never had a word of encouragement; it was a discord from her in every possible way. Q. What did she say? A. Called him an old baldhead, an old grouch, an old lunkhead; never would be anything, and innumerable things." The complainant thus describes his experience: "She, of course, commenced to nag me all the time.  Q. What did the nagging consist of?  A. Called me all kinds of names, graybeard, flathead, baldhead, and speak of me as daddy, in a disrespectful way, and taught the children to do the same.  Q. Would she make those remarks before other people? A. Yes, sir; and before the children.  Would not hesitate a bit to call me and speak of me in a disparagingly way even before the trustees.  I know she did on several occasions before Mr. Wagner while at the table, and also before Judge HERRING."  As to the disparagement of the complainant's professional ability, this evidence was given by him: "Q. State whether or not Mrs. Biddle frequently ridiculed you in the presence of other people.  A. Often. And particularly in the presence of some of my friends and children.  Q. In regard to your professional ability? A. Yes, sir; and my business ability.  Q. What did she say about you?  A. Just as I said before, if I had more business tact they would have more money."  The direct interference with the complainant's work at the hospital consisted of interruptions in his surgical work by calling for him at different times and by solicitations to members

of the board of trustees to make improvements in the
building, particularly in the administrative part where the
complainant lived, which improvements he was not will-
ing to ask for. There was evidence of frequent calls of the
respondent at the operating room when the complainant
was there engaged in professional work. It was not said
that she came into the room but that she sent for the
doctor or called for him there, and some of the witnesses
testified that she frequently made requests to members of
the board of trustees for repairs, refurnishing and other
improvements in the building. Whether these improve-
ments were needed or not was not shown by the testimony.
In this connection reference may also be made to the
evidence that about two years before the divorce pro-
ceeding was commenced the respondent and her daughter
appeared before some of the members of the board of
trustees when they were at the hospital and preferred
charges against the complainant stating that he neglected
his duties, that he was a man of immoral character and
that he should be discharged. The testimony that the
respondent encouraged her children to be disrespectful to
the complainant is of so trivial a character that it could
not have had weight with the court below. One of the
witnesses, Dr. Davies, referred to an occasion when the
libelant's son, John, applied a vulgar epithet to his father,
whereupon the complainant walked away. The mother
called the son to her and the witness narrates this occur-
rence: "She told John he must not talk to his father that
way; that she was surprised. Q. Did or did not her lan-
guage fit the words? A. No, sir. Q. What was her manner
in telling him that? A. Her manner was rather one of
applause." On another occasion the same witness also
narrates another occurrence at the family table in which
a discussion arose as to the meaning of the word "par-
amour" and in the conversation the complainant's daugh-
ter made a remark which the witness interpreted as an
intimation of improper conduct on the part of the com-
plainant. The witness then proceeded, "Q. What did

Mrs. Biddle say during the discussion? A. Mrs. Biddle laughed and rather upheld Marie in her point. Q. What did Mrs. Biddle say when the doctor chided her? A. The doctor chided Marie and thought she did not understand what she was saying. Q. What did Mrs. Biddle say to that? A. I do not recall exactly except the substance, she upheld Marie in her remarks. . . . Q. Can you or can you not give the exact words Mrs. Biddle used? A. No, sir; I cannot. Q. Was or was not the effect of them as stated by you? A. Yes, sir, the general effect and general understanding of the statement made." Some testimony was introduced to show the interference of the respondent with the complainant in the government of the children. In the same connection was the following evidence from Judge HERRING: "Q. What do you know about Mrs. Biddle's relations with her children and what she taught them to do toward Dr. Biddle? A. I know this merely that at the table or away from the table, if the child committed some act of childish indiscretion, Mrs. Biddle invariably sided with the child and against the doctor." By Mr. Lenahan: "Q. Is that unusual in a household? A. I am not so sure, and she readily upheld them frequently when in my judgment, of course, she perhaps had better preserve a better demeanor, at least keep quiet, and side with neither party." There was evidence that the respondent took several trips when her husband was not with her and that she insisted that their daughter be sent to an expensive school, and much more that was irrelevant to the case under consideration. The respondent denied all the material allegations made in the evidence for the complainant, and numerous witnesses were called in contradiction of the complainant's witnesses. The number of the witnesses is too great and the volume of evidence too large to admit of an analysis of the testimony of each witness. The complainant assumes the burden of showing by a preponderance of the credible competent evidence that the respondent has been guilty of one or both of the charges contained in the libel. The conduct of a wife that

will entitle her husband to a divorce for the first cause set forth in the complaint must be not only such as renders his condition intolerable or life burdensome but such as amounts to cruel and barbarous treatment. Both of these statutory elements must concur: Fay v. Fay, 27 Pa. Superior Ct. 328. What is cruel and barbarous treatment? It is defined in 1 Bishop on Marriage and Divorce, sec. 717, as follows: "Cruelty, therefore, is such conduct in one of the married parties as renders further cohabitation dangerous to the physical safety of the other, or creates in the other such reasonable apprehension of bodily harm as materially to interfere with the discharge of marital duty." This definition is quoted with approval in McMahen v. McMahen, 186 Pa. 485. It is not necessary under the Act of May 8, 1854, P. L. 644, to show that the acts of cruel and barbarous treatment there referred to are those alone that endanger life. Under the Act of March 13, 1815, 6 Sm. L. 286, giving to a wife a right to a divorce for cruel and barbarous treatment it must be shown that the husband's conduct endangered his wife's life, but the act of 1854 to which the Act of June 25, 1895, P. L. 308, is an amendment does not limit the right of a husband to a divorce to those acts of cruelty which endanger life. Under the latter statute cruel and barbarous treatment must nevertheless be shown. It is not sufficient to prove that the conduct of the wife rendered the condition of her husband intolerable and life burdensome, unless it appear that this was the result of her cruel and barbarous treatment. And this treatment must be exhibited in a course of conduct. An occasional expression of anger or the use of such opprobrious epithets as are attributed to the respondent in this case uttered in heated discussions with the complainant or the comments on his business ability or criticism of his capacity to secure the best financial results from his professional skill do not amount to cruel and barbarous treatment within the meaning of the statute as interpreted by the Supreme Court and this court. There were no acts of physical violence nor threats to in-

jure the complainant in person or property, nor do we
find any evidence tending to show any ground for that
"reasonable apprehension" of personal violence to which
Judge KING referred in Butler v. Butler, 1 Parsons' Select
Eq. Cases, 329.   The parties lived together for several
years after the date when the complainant alleges his wife
began to ill treat him, and it is evident from his own testi-
mony that the agreement of separation and the applica-
tion for a divorce did not have their origin in any physical
injury committed or threatened.   If calls were made by
Mrs. Biddle for her husband when he was engaged in work
in the operating room he was not bound to give attention
to them.   There is no suggestion that they were made
maliciously or with any intention to interfere with his
work.   At most, they were inconsiderate and untimely.
It should be said, too, that other physicians and some of
the nurses who had equal opportunity with Dr. Reese and
Dr. Davies to know whether the frequent calls were made
by the respondent which the complainant and Dr. Reese
describe had not noticed such conduct on the part of
Mrs. Biddle.   The language used as set forth in the testi-
mony of the complainant and some of his witnesses, it
may be conceded, was not respectful nor becoming from
the lips of a wife but neither that nor her complaint that
her husband did not make the most of his opportunities
nor the undefined "nagging" referred to constituted cruel
and barbarous conduct.   The respondent denied the use
of the offensive names and all of the conduct at the table
and elsewhere which the complainant makes the basis for
his petition for a divorce and in this denial she is strongly
corroborated in important respects by a number of wit-
nesses who had equal opportunity with those called by
the complainant to observe the relation and conduct of
the complainant and respondent at various times through
a series of years.   Indeed, the testimony of Mr. Wagner,
a trustee and witness for the complainant, who was fre-
quently at the hospital and ate at the family table, con-
tradicts the testimony of Dr. Reese as to the constant

application of offensive names to the complainant, as does also the testimony of Mr. Allison, another trustee called by the complainant who visited the hospital about twice a month and who frequently dined there. The same may be also said of the testimony of Mr. Righter, another trustee who attended the meetings of the board and often ate at the table of Dr. Biddle. The last named two witnesses heard nothing at the family table showing a disagreement between the parties. Giving to all of the testimony of the complainant which is relevant to the issue the weight to which it is entitled we think it does not exhibit a case of cruel and barbarous treatment and when read in connection with the testimony of the respondent it does not disclose a preponderance of evidence in support of the libelant on the subjects which are material and pertinent to the case.

If the matters alleged against the appellant were clearly established and unexplained a case would probably exist of indignities to the person, which is the second cause of action set up in the libel, but we are unable to find from a careful and painstaking examination of all of the testimony that this charge is established. The serious part of the complaint which is supported by evidence is the application of defamatory names, the charge of immoral conduct, interference with the business of the hospital and the effort to have the complainant removed from his position. We have already referred to the evidence relating to the alleged meddling of the respondent with the affairs of the hospital, but when this evidence is examined it is found to consist of applications by the respondent to her husband and to some of the members of the board of trustees for improvements which she thought necessary or desirable in that part of the building in which she and her family lived. Even if these requests were urgent and frequent such action does not involve any element of indignity to the person of the complainant. The request may have been appropriate or not, but we cannot consider the expressed desire of the respondent to have a new carpet or

new curtains or a new floor in some part of the building as an insult to her husband or a reflection on the capacity of the trustees to manage the affairs of the hospital. The respondent may have desired better surroundings than they felt justified in affording, and if her requests were unreasonable or untimely they were entirely at liberty to refuse them or ignore them. That they were unreasonable has not been proved. That they are not a legal basis for a divorce or an element in the evidence necessary to produce that result is manifest. Nothing in relation to the interference by the wife with the husband's discipline of the children is shown which probably does not occur from day to day in a very large proportion of the families of the country. It is a matter of very common observation and has never been heretofore regarded as tending to show a course of conduct exhibiting either cruelty or indignity. If it be conceded that the respondent called the complainant the bad names referred to, the fact is to be noted that she had strong provocation to such conduct by reason of the admitted actions of the complainant. He states that their troubles started in 1897 some time during the fall, about which time he noticed her doing on a number of occasions that which did not appear to be a correct thing for a married woman to do. He then says: "From the time I commenced to accuse her of things then she commenced to retaliate by many acts and particularly at the table. . . . She would for instance talk disparagingly of me, and tell me I was not a business man, and if I had more business tact I would make more money, and we could all have a better time, and speak of me in a slurring manner about the operating work I was doing, surgical work. Constantly telling me to go to the board of trustees so I would get more salary, so we could have more money, and always telling me things that the trustees were doing, and what they ought to do, and what they did not do, and I ought to do this, and do that, and, of course, in that way got me in trouble with my board of trustees." On cross-examination he says: "I accused her first because I knew

she was guilty," and that he continued accusing her of unfaithfulness; that her unfaithfulness was the original cause of their troubles; that time and again in the presence of his children and others he had said that she was untrue to him; that he announced many times to his children that their mother was a "whore" and that he repeatedly made this accusation in the presence of strangers. In reply to the question in this connection, "The fact is you accused her hundreds of times," the complainant replied, "Probably in the thirteen years, yes, I did." No other accusation as degrading could be made against a married woman as that which the complainant frankly admits he made against his wife very many times and which he persisted in up to the time of the taking of the testimony, although he had withdrawn the charge of adultery on an application to the court in which he stated under oath that he had been misinformed and did not believe it to be true. In view of the gravity of this accusation and its persistent repetition it would not be surprising to learn that the respondent retaliated and if she did not, as she claims, she exhibited a remarkable forbearance. A complainant is not entitled to a divorce where the indignities relied on are provoked by the complaining party unless the retaliation is excessive: Richards v. Richards, 37 Pa. 225; and it can hardly be contended here that the respondent equaled the complainant in the enormity of the accusations. The conversation of the respondent and her daughter with some of the members of the board of trustees about the time the complainant and respondent separated apparently grew out of information received by Mrs. Biddle that her husband was proposing to get a divorce and her belief that he was encouraged in that undertaking by one or more of his friends on the board of trustees. That occurrence was long after the accusations made by the complainant and after the domestic affairs of the parties had reached a crisis. The complainant wanted to be separated from his wife and it was perhaps not an unnatural act on her part to express her feelings to any

person who sympathized with him or encouraged him in the course of conduct which he proposed to adopt. It was not the cause of the temporary retirement of the complainant from the hospital. That action is called a resignation, but the promptness with which he was reinstated at an increased salary leaves the impression that it may have been a plan adopted by the complainant to accomplish the removal of his wife from the hospital building. However that may be, the complainant was at no disadvantage in the matter of accusations and epithets. He admits in his testimony that he tried to hold his own in that respect and there can be little doubt from the testimony that he succeeded. That the parties for several years had an uncomfortable and disagreeable domestic experience is quite probable and is much to be regretted, but the alienation of husband and wife must have been brought about by one of the parties because of conduct which is recognized in law as a cause of divorce, to justify a decree, and we are not satisfied in the light of all of the testimony here exhibited that the complainant has made out a case. Platt v. Platt, 38 Pa. Superior Ct. 551, and Hexamer v. Hexamer, 42 Pa. Superior Ct. 226, are authorities in harmony with the conclusion that a decree should not have been entered in this case. We are all of the opinion that the evidence does not disclose a state of facts sustaining the averments of the libel.

The decree is therefore reversed and the libel dismissed at the cost of the appellee.