## Kelly *v.* Kelly, Appellant.

*Divorce—Cruel and barbarous treatment — Evidence — Insufficiency.*

A libel in divorce, alleging cruel and barbarous treatment, will be refused, where the record evidence fails to disclose any such acts as would render the libellant's condition intolerable and life burdensome, and the evidence consisted of a recital of minor disagreements, followed by partial reconciliations, extending over a long period of years.

Argued March 14, 1924.   Appeal, No. 3, Oct. T., 1923, by respondent, from decree of C. P. Clinton Co., Oct. T., 1919, No. 138, granting a divorce in the case of Thomas F. Kelly v. Martha E. Kelly, nee Martha E. Price.   Before ORLADY, P. J., PORTER, HENDERSON, TREXLER, KELLER, LINN and GAWTHROP, JJ.   Reversed.

Libel in divorce.   Before BAIRD, P. J.

The case was referred to H. T. Hall, Esq., as master, who recommended that a divorce be granted.

On exceptions to the master's report the court dismissed the exceptions and granted a divorce. Respondent appealed.

*Error assigned* was, among others, the decree of the court.

*Cornelius C. O'Brien,* of *Byron, Longbottom, Pape & O'Brien,* for appellant.

*Henry Hipple,* and with him *M. E. Haggerty,* for appellee.

OPINION BY TREXLER, J., July 2, 1924:

The master recommended a decree of divorce and the lower court granted it. The grounds laid were cruel and barbarous treatment and indignities to the person. To entitle the libellant to a divorce in such case there must be such a course of conduct or continued treatment as to render the husband's condition intolerable and life burdensome: Schultze v. Schultze, 33 Pa. Superior Ct. 325; Krug v. Krug, 22 Pa. Superior Ct. 572; Crawford v. Crawford, 64 Pa. Superior Ct. 33. Such treatment must be exhibited by a course of conduct: Biddle v. Biddle, 50 Pa. Superior Ct. 30. Judged by this standard, we do not think the libellant is entitled to a divorce. The record is too long to review it with particularity, and many of the facts produced to show the family life of the parties have no element of cruelty or barbarity in them. The couple lived together for seventeen years; from an humble and no doubt happy beginning, at which time the husband earned $750 per year, they continued their marital existence until it ended unhappily when he was earning an annual salary of $16,000. During this time she bore him eleven children, nine of whom are still living. It is significant that notwithstanding the terrible

time he claims to have had, there was no abstention from conjugal embraces, and the fruit of the union appeared at regular intervals. No doubt the wife cumbered with much serving, the care of the children and the troubles incident to the rearing and bearing of a large family was often irritable and sometimes abusive. In the large mass of testimony which is given with great minuteness, he alleges various misconduct on the part of the wife in regard to matters that refer merely to the running of the household and which have nothing to do with the charge contained in the libel. There are four instances which require special attention. The one harks back to the year 1909 when, according to the libellant, the wife developed an ungovernable temper and one time after an altercation went up stairs and left the libellant with three small children to take care of without any assistance and thus compelling him to remain away from his business. She was jealous of other women and occasionally accused her husband of infidelity. She told him if he would give her $100 she would leave him, and he gave that amount to her brother fifteen years of age and told him to take it and tell her to go. On one occasion she left to purchase some family supplies and did not return until nine o'clock in the evening of a summer day. Her husband met her at the door and remonstrated with her for being out so late. Nine o'clock does not seem an unreasonable hour, considering the time of the year. She retorted with abuse and cursed him. He gave her what he describes as a "little tap" with the side of his hand, which act caused her to rave at him whereupon he pushed her in a chair and held her there until she promised to behave herself. When he let her go she ran to the mantel, got a bronze statute with which she said she would kill him. He walked up to her and apparently without any resistance on her part took it from her. His sister interfered and as he turned to speak to his sister, she then pulled his hair and he choked her so that she might let go. His wife wished to telephone to the

chief of police, but he told her he would pull the telephone off the wall if she attempted to 'phone. We have given the details of this occurrence. It would seem the husband had the situation well in hand as his wife proceeded and the honors, if such a term be appropriate, might be said to have been quite evenly divided. On another occasion he states she had one of her tantrums and he locked her in her room and she threatened to break the window if he did not let her out. He told her that if she broke the window he would put her cold on the floor. Later in the same evening she threw a nursing bottle at him. The next occurrence occurred on Labor Day, 1919, the day when respondent left libellant, when he arranged for his family to go for an automobile trip with his sister, who seems by her presence not to have contributed to the peace of the family. On this occasion he went downstairs and the automobile was standing in front of the house. The children were all dressed ready to go. Respondent, who was not counted as a member of the party, and became irritated by the slight, got into the car, threw herself back and said that she would break the head of the person, using a vile term, who got into the car until she received $50. Mrs. Garth, a neighbor, and a half dozen ladies were over on their porch and it is said respondent was roaring at the top of her voice. Finally libellant compromised by paying her $25 whereupon she got out of the car and went up on the porch and used bad language concerning her husband. His feelings on that occasion are well expressed by him when he says that he felt like giving her a good beating up and was sorry he had not done so. There were a half dozen disinterested witnesses to this occurrence but none were called to corroboate his story. The other charges consisted of extravagance in the family, the use of too much butter, the neglect of the children, getting up late in the morning, failure to keep servants for any length of time and a whole lot of similar charges which have been carefully culled out from a long mar-

ried life extending over a period of seventeen years. The libellant has proved too much, for a number of disinterested witnesses were called who testified to facts which are entirely inconsistent with the picture he draws. There is evidence that the children were well taken care of and dressed cleanly; that the services of the servants, considering the condition of society at the present time and the difficulty there is in getting good domestic help, were retained, one for two years and for a long time she did the household work; that the use of vile language was only occasional; very many of the occurrences which were testified to did not occur in the presence of the husband and could not have affected his peace of mind or health. There was no proof in most instances that they were communicated to him. The disobedience of the children, even if true, could not give any support to the charges. A number of witnesses who had occasion to be in the house quite often never heard the respondent use any profane language toward her children, but testified that she treated them kindly. She had her own banking account which her husband furnished and against which he allowed her to check. Although he testified that the youngest child was not healthy through neglect and had a sore spot as big as a hand on its leg, the evidence was that she gave it a bath daily during the morning recess, and what he considered a sore due to neglect, it was shown was due to teething. Libellant testified that she was too extravagant and at the same time complained that she bought clothing for the children which were not good enough. We will not refer to the evidence of any acts that occurred after he left, as we do not think it affords any aid in determining the real question in the case. Out of the large mass of testimony covering many pages, we have selected what seems to be most important. According to our view of the case these parties lived together unhappily sometimes, but reading beween the lines and considering the incidents, their condition for a long

period was tolerable, although their ardor for each other no doubt had cooled. The attitude which the libellant took does not impress us. The incidents that occurred in 1909 are not barred by any limitation but it is worthy of remark that in his attempt to establish his case he had to go so far back in order to find testimony to support it. There were periods between these alleged outbreaks, when as the libellant himself asserts, they got along fairly well and seemed to enjoy each others society. On one occasion she wished to learn to dance and he took her to Jersey Shore but there was no one there to teach her so she had to remain uninstructed. We do not agree with the court that the great preponderance of evidence is in favor of the libellant. In fact in his effort to make out a case against his wife he over-reaches himself and that he brings in all matters which do not support the charge, but refer to what might be called side issues and in these matters he is contradicted by reputable witnesses. Her testimony seems to be more frank than his for she admits certain occurrences and does not seek to shield herself. He has the burden of proof. We must take a general view of the situation in order to establish whether a course of conduct such as he claims was persisted in and we are led to the belief that comparatively unimportant incidents have been magnified and made to appear as though respondent was deliberately intending to make life miserable for the libellant. It is hard, without unduly encumbering the record, to go into the many instances which are referred to, but we have carefully gone over the testimony and are of the opinion that the libellant has not proven his case.

There is an application for the allowance of counsel fees to the appellant's attorney. We think the claim is well founded and we think $500 is a proper amount.

The order of the lower court granting a divorce is vacated. The divorce is refused. Libellant is directed to pay the costs together with $500 counsel fees for appellee's attorney.