Hess *v.* Hess, Appellant.

Argued May 2, 1932.

Before TREXLER, P. J., KELLER, GAWTHROP, CUNNINGHAM, BALDRIGE, STADTFELD and PARKER, JJ.

*Bessie A. Kann,* for appellant.

*Joseph J. Goldsmith* for appellee.

OPINION BY CUNNINGHAM, J., July 14, 1932:

Estell R. Hess filed a libel, March 6, 1931, for a divorce from the bond of matrimony with Edwin S. Hess; it was drawn under paragraph (d) of Section 10 of "The Divorce Law" of May 2, 1929, P. L. 1237, which provides that it shall be lawful for the "innocent and injured spouse" to obtain a divorce upon proving that the other spouse has "committed wilful and malicious desertion, and absence from the habitation of the injured and innocent spouse, without a reasonable cause, for and during the term and space of two years."

The case was tried by a judge of the common pleas; respondent appeared without counsel, but, at his own request, was examined by the court. On July 11, 1931, a decree was entered in favor of the wife and the husband has appealed.

Libellant and respondent were married June 20, 1912, and have no children. The testimony indicates that libellant got rather the worst of the bargain, but that is not a sufficient ground for the dissolution of the marriage contract. The Commonwealth has an interest in every contract of marriage; divorces are not to be obtained easily and the marriage relation may not be dissolved without clear proof of imperious reasons (Biddle v. Biddle, 50 Pa. Superior Ct. 30, 34); the burden was on libellant to establish every element of her charge by convincing evidence and it is our duty to consider with care whether she has successfully met that burden.

We have examined the evidence with these principles in mind and our independent conclusion is that it does not warrant the granting of a divorce.

598

These parties never had a "habitation" of their own; they lived with libellant's father from the time of their marriage until December 1, 1924, the date of the alleged desertion. Respondent was a traveling salesman, earning, according to his statement, $800 to $900 per year and probably did not contribute very liberally toward the maintenance of the household. Indeed, this seems to have been the root of the trouble between him and his wife and father-in-law.

Libellant's account of the separation reads: "Well, I was sick, Mr. Hess wouldn't work, and I had just worried myself into a nervous spell; I just really didn't know what to do with myself. I couldn't sleep at night and I just didn't know what to do. There was no one at home to take care of me, and I went over to my sister's until I could get on my feet again. Q. What was her name? A. Helen Hirschberger. Q. Where did she live? A. 103 Grant Ave. Q. How far was that from where you lived? A. About three blocks. Q. And stayed there until when? A. I was in bed off and on for about three weeks; then of course there was no one at home. I went back and forth up to my place for about three months. Q. What happened the first of December, 1924, while you were at your sister's home? A. Helen told me my husband had brought the key up and said he was leaving. That was about the first of December, 1924, about that time. Q. Did you go back home shortly after that, to your home where you had lived with your husband? A. I went back and forth to get clothes, but I didn't stay until the last of February. Q. February of the next year, 1925? A. Yes. Q. Then what happened; did your husband come back there? A. He came back and got a suit case and a spray for flowers one evening when I had company and left. Q. Did he ask you for the suit case? A. He said he had come for it; he was going to Oklahoma. ...... Q. Did you ever ask your husband why he

was leaving or why he would not come back and live with you? A. No."

Respondent did not go to Oklahoma; his contention, as outlined in his evidence, is that libellant, in fact, deserted him. His testimony was: "She deserted me on the 19th [of November, 1924] and went up to her sister's home. I stayed in the home. I was paying the rent and I stayed there for two weeks. ...... Q. Did you take the key up as has been testified? A. The key, when she advised me to leave and go to the Y. M. C. A., she says 'As soon,as father gets over this—he has a dislike towards you—you go up to the Y. M. C. A., and live, and we will likely get together later on,' and I said I would, I would vacate the home because he wouldn't rent to me any longer. I paid him his month's rent and vacated and went to the Y. M. C. A."

The only corroboration of the most material part of libellant's testimony was by her brother-in-law, W. W. Hirschberger, who, after relating that libellant came to his home, ill, and that respondent brought the mail up several times, continued: "Q. Did he [Hess] come there about the first of December, 1924? A. Yes. Q. What happened on that occasion, will you tell the court? A. He left the key to the house where they were living and said that he was leaving. Q. What house was that? A. Mr. Rheam's [her father's] home. Q. The home where he and his wife had always lived? A. That's right. Q. At or about what date was this? A. I would say about the first of December or latter part of November. Q. What was said, as near as you can remember it? A. He said he was leaving, here was the key to the house, he was leaving. Q. Did he say where he was going? A. I asked him what he was going to do. He said something about going out and looking for a job."

Mrs. Helen Hirschberger, libellant's sister, testified

that she overheard this conversation between respondent and her husband and reported it to libellant.

Clearly, libellant's case is lacking in proof of the essential elements of the cause for divorce assigned by her—a wilful and malicious abandonment of matrimonial cohabitation, without a reasonable cause and with a clear intent to desert, wilfully and maliciously persisted in for two years. The natural inference from the facts appearing upon this record is that, instead of this case being one of "desertion" by a husband, it was a "discarding" by a wife and her father of an undesirable husband and son-in-law. Respondent seems to be more interested in visionary financial schemes than in the performance of his marital obligations and libellant may be justified in her attitude toward him, but she has not shown that she is entitled to a divorce. If he is not contributing to her support in proportion to his earning capacity, her remedy is in a different tribunal.

The decree is reversed and the libel dismissed.