## Meinel *v*. Meinel, Appellant.

Argued December 15, 1932.

Before Trexler, P. J., Keller, Gawthrop, Cunningham, Baldrige, Stadtfeld and Parker, JJ.

*George J. Edwards, Jr.,* for appellant, cited: Krupp v. Krupp, 95 Pa. Superior Ct. 474.

*H. Eugene Heine,* and with him *Walter E. Schembs,* for appellee, cited: Sharp v. Sharp, 106 Pa. Superior Ct. 33; May v. May, 62 Pa. 206; Melvin v. Melvin, 130 Pa. 6.

OPINION BY STADTFELD, J., July 14, 1933:

This is an action of divorce A. V. M. brought March 21, 1930, by the husband, William John Meinel, against his wife Jennie Margaret Meinel, the ground for divorce being alleged as such indignities to the person of the libellant as to render his condition intolerable and life burdensome, thereby causing him to withdraw from his home and family on or about March 19, 1930.

Respondent having filed a rule for a bill of particulars, a bill of particulars was filed by the libellant and respondent filed an answer thereto.

The case was referred to a master, who filed a report recommending that a decree of divorce A. V. M. be granted. Respondent's exceptions were overruled and the report of the master was approved his findings and conclusions being adopted as the findings and conclusions of the court. STERN, P. J., dissented. A final decree in divorce was entered August 29, 1932, and from that decree this appeal was taken.

In his bill of particulars the libellant charged that

the respondent refused to assume the usual duties of a housewife; was indifferent to guests in the home; objected to libellant's studies and his long work hours; objected to his contact with neighbors; insisted upon libellant giving her certain attentions; expressed dissatisfaction with everything libellant did; was constantly quarrelsome without cause; showed studied neglect and made unmerited reproaches; objected to having children; refused to care for their child; influenced their child against libellant; refused to do housework, feigned illness, and was deliberately malingering during last five years parties were together; caused libellant to spend thousands of dollars on doctors and for medical attention; caused economic position of parties to be handicapped; on one occasion hit libellant in the face, breaking his glasses, and calling him a "God damn liar"; made statements that libellant was leading an immoral life and committing self-abuse; told libellant an untrue story concerning one of her doctors; referred to libellant as an atheist; caused libellant to lose weight; and so affected libellant by her acts that on four occasions his distress of mind so affected his nervous system that he became temporarily blind.

Respondent's answer denied every allegation of the libel and the bill of particulars.

Libellant's bill of particulars covers eleven pages of printed matter. Its undue length is no doubt due to the fact, as appears from the testimony, that it was prepared in large part by the libellant himself.

The libellant and respondent were married at St. Paul Episcopal Rectory, Broad and Venango Streets, Philadelphia, by Dr. Dagar, September 1, 1914. The libellant is 37 years of age; the respondent 36 years of age. Both libellant and respondent have lived in Philadelphia all of their lives, both having been born there. Prior to the marriage the libellant was a foreman

machinist and after marriage he continued as foreman, later changing his employment. He became vice-president of the E. G. Budd Manufacturing Company, in charge of manufacturing.

The respondent, prior to marriage, was employed by the Lutheran Publication Society, as a stenographer. After marriage, with the exception of two short periods, she had no employment. Prior to marriage the libellant lived at 4226 N. Franklin Street. The respondent lived at the Y. W. C. A., at 18th and Arch Streets. Immediately after marriage the parties resided, as husband and wife, at 4226 N. Franklin Street, where they lived for four years, then moving to 5325 Rising Sun Avenue, Philadelphia, where they remained until the libellant left the respondent. The separation occurred March 19, 1930. After the separation the libellant resided at Alden Park Manor, Philadelphia, while the respondent continued to reside at 5325 Rising Sun Avenue, Philadelphia. One child was born of the marriage, a girl named Betty Jane Meinel, the date of her birth being November 28, 1926. The child is in the custody of the libellant.

Respondent also filed a libel against libellant for a divorce from bed and board on May 8, 1930.

According to libellant's testimony, Mrs. Meinel's attitude which he claims made life burdensome to him, started almost immediately after the marriage.

The sum total of all the libellant's testimony—exclusive of the charge of immorality or degeneracy—amounts to charges that the respondent was not helpful, but rather retarded, the libellant in his business relations; that she was not a good housekeeper, and did not do what she should have done in that respect; that she complained and nagged about his late hours and absence from home; that she did not do her full duty as a mother in the care of the child; that she was critical of the friends of libellant so that they ceased

their visits to his home; that she objected to assistance and acts of kindness extended by him to his sister who had been deserted by her husband; that she was perhaps a malingerer, or at least a neurasthenic, causing him to expend large sums of money in doctor bills and sanitoriums.

Libellant called a number of witnesses to corroborate his testimony in relation to the charges to which we have referred. A number of witnesses testified to the kindly and affectionate treatment by Mr. Meinel of Mrs. Meinel and the lack of any responsive conduct on the part of Mrs. Meinel from their own observation. A large part of the record is made up of testimony on part of libellant, and witnesses called by him, to establish alleged malingering and false illnesses on the part of respondent. A number of physicians were called by each side. Some of these testified that respondent was suffering from neurasthenia, some that her ills were imaginary, and others that she was malingering.

Libellant claimed that as a result of respondent's conduct he suffered serious impairment to his health, resulting in several attacks of temporary blindness, culminating in 1929 in an almost complete breakdown.

None of these charges enumerated—excepting those of immorality and degeneracy—or all of them put together, amount to such indignities to the person as to justify a divorce. A wife may be a poor help-mate, she may be a careless housekeeper or even a slattern; she may not give proper care to her child; she may be nagging in disposition and a fault-finder, she may be lacking in affection, she may be a malingerer or a neurasthenic, but all these matters have little or no bearing or relevancy to the charge alleged in the libel, viz: indignities to the person such as to justify the granting of a divorce.

In the period of almost sixteen years of the married

life of these parties the record shows only one instance of a claim of violence. This, libellant testified, occurred on a Sunday morning in June of 1929, when a dispute arose because Mr. Meinel was late in returning home for dinner after playing golf. This, according to his testimony, resulted in respondent slapping him in the face and her using some profane language. He responded in kind, if not in kindness, by slapping her in the face. Respondent denied having slapped him in the face or having used any profanity. Betty Beyer and Lena Tripple, the domestics who lived in the Meinel home, testified that they never saw or heard fighting, fussing or quarreling between the parties.

One of the serious charges on which libellant relies is that of false charges by respondent of immorality, infidelity and acts of degeneracy. Libellant testified that during the summer of 1929, while respondent was at Beach Haven, N. J., there was unfavorable gossip that came to his ears; that as a result of these reports he went to respondent and asked what could she hope to gain by letting the attendants at the Baldwin Hotel know that he was not living right with her, that he was resorting to self-abuse and bad women. He told her Mrs. Schmidt had told him that she would not have said anything if this had not all come out; that now, that it is out, she might as well let him know that Mrs. Meinel had told her that he was not doing right by her, that he was resorting to self-abuse; that after he had told Mrs. Meinel what he had learned at Beach Haven, her answer was that it was all too terrible to talk about, that she would write him a letter the next day which she did and left on the bureau, stating that she did not know that Mrs. Schmidt would betray her confidence, and that while she had told Mrs. Schmidt such stories, she did not say that he was doing it, but that she thought he was doing it. The letter, however, was not produced, libellant claiming it had gotten into the possession of respondent.

Testifying further to these charges, libellant says: "She came to my room and accused me of going with bad women, otherwise I would sleep with her. Her treatment of me was such that I naturally had very little desire for sexual intercourse and during the last two years, it usually was the result of her coming to me rather than I going to her."

Mrs. Minnie J. Schmidt, a witness called for libellant, testified that she knew him since he was a boy, and had known Mrs. Meinel for 11 years; that she and her husband frequently visited the Meinels, and that she and Mrs. Meinel belonged to a card club together. She testified that Mrs. Meinel called her on the telephone, as was her habit, in January or February, 1929, at 11 o'clock in the morning, and when she got to the telephone, she said: " 'Hello, is that you Minnie?' I said: 'Yes, is this you, Jennie?' She said: 'Yes, I would like to see you sometime if I can.' I said: 'I have not the time just now, can't you tell me what you want to see me about ' She said: 'What do you think? Bill is using self-abuse and running around with other women.' I said: 'My, Jennie, how can you say anything like that over the telephone.' She said: 'Well, it is true.' I said: 'That is terrible. It don't seem like a man who works hard and comes home at night tired. I don't believe anything like that.' She said: 'Well, it is true.' I said: 'How do you know?' She said: 'I looked through the keyhole. That is the truth, and I would like you to deny it.' ' "

Mrs. Schmidt stated that she had this conversation with Mrs. Meinel in January or February, 1929, and told Mr. Meinel about it in August, 1929; that Mr. Meinel's sister, Sophie Quigley, was present at the latter date. She was not, however, called as a witness.

Betty Beyer, the domestic in the Meinel home from August, 1926, until the end of January, 1928, returning after the absence of about a year, testified on be-

half of libellant concerning a conversation with Mrs. Meinel after she (Betty) had come back from the seashore in 1929. "Well, when I came back from the shore that summer, Mrs. Meinel seemed very much upset. I said: 'What is the matter with you?' She said: 'That I had told something to Mrs. Schmidt, and I never thought she would tell my husband, but she did, because, she said: 'Mr. Meinel was very angry.' I said: 'What did you tell Mrs. Schmidt?' She said: 'You know Betty Beyer.' I said: 'I don't, what do you mean?' She said: 'Well, one evening Mr. Meinel went to bed and left his door open, and I watched him and I saw him abusing himself.' She said: 'Don't tell anybody, I only told Mrs. Tripple.' Q. Was anything else said at the time? A. No, sir. Q. Did you say anything to her about it? A. I said: 'It is too bad that you tell such a thing, why didn't you talk to your husband. You are his wife.' She said: 'I thought that talk would bring him around, but I did not know that she would tell him like I told her.' "

Mrs. Lena Tripple, another domestic in the Meinel home, testified to a conversation with Mrs. Meinel in August of 1929. "Q. Will you tell us what Mrs. Meinel said to you? A. Mr. Meinel came down to Beach Haven one week-end in the month of August, 1929. When he came down, he seemed very much worried, he did not seem like himself. Mrs. Meinel said: 'There is something the matter with Bill.' Mr. Meinel told her father what it was, and her father told her— Q. Told Mrs. Meinel? A. Told Mrs. Meinel, and Mrs. Meinel said: 'I know what is the matter with Bill.' And she told me then— ...... A. Yes, sir, Mrs. Meinel said: 'I know what is the matter with Bill. He told my father, and father told me.' She said: 'Do you remember last December, when I went down to the Bellevue Stratford to a card party,

and I met Mrs. Schmidt there?' I said: 'Yes, I re-member that.' She said she had told Mrs. Schmidt something about Bill, and she has told him, and it is just terrible and Mrs. Schmidt told Mrs. Meinel that she is sure he is not that kind of man at all, but she told Mrs. Schmidt, thinking she would tell her hus-band, and her husband would tell Mr. Meinel, being they were close together. I said: 'If you said some-thing about Mr. Meinel that you are sorry for, why don't you go to him and have a talk and fix it up?' She said: 'No, I won't do that. I will write him a letter.' That was the end of our conversation about that. Q. Did she ever, later on, in any way, indicate whether or not she had written him a letter? A. She said she wrote him a letter, but said she did not know whether he read it or not."

On her own behalf Mrs. Meinel testified, denying the various accusations and each of them against her by libellant. She denied that she had told her husband an untrue story concerning one of her doctors, Dr. Bradley, as testified to by libellant. She denied having told him that Dr. Bradley had taken undue liberties with her person. She stated that Dr. Bradley had questioned her regarding her very personal sexual relations with Mr. Meinel and she took offense at it, and so told Mr. Meinel.

Mrs. Meinel denied making any statements that libel-lant was leading an immoral life and committing self-abuse. She denied writing a letter to him in relation to what he claimed she had told Mrs. Schmidt or that in that letter did she state that she did not know that Mrs. Schmidt would betray her confidence. Mr. Meinel failed to produce the letter, claiming it had disap-peared from a bureau drawer in which he had placed it. The further fact that the rumors concerning these reflections against him came to his attention at Beach Haven as having been made by Mrs. Meinel to the

attendants at the Baldwin Hotel, naming a Miss Thompson and a young man by the name of Hall, and his failure to call either of these parties or take their depositions, casts a serious doubt as to the making of the alleged charges by Mrs. Meinel. It also seems strange that such charges, casting such a serious reflection on her husband should have been made by Mrs. Meinel over the telephone, as claimed by Mrs. Schmidt. Mrs. Schmidt testified that she did not talk to anybody concerning this incident, not even to her own husband, and did not tell Mr. Meinel until August, 1929. Notwithstanding this occurrence, she invited Mrs. Meinel to her home for Christmas dinner.

Betty Beyer, who testified to similar charges having been made to her by Mrs. Meinel, said she did not tell her own husband, or Mr. Meinel's mother, nor Mr. Meinel or any one else, and that she first told the lawyer on the very day she testified. After the separation she went over to Alden Park Manor with Mr. Meinel where she has been continuing to act as nurse.

Mrs. Lena Tripple, also still in the employ of Mr. Meinel, was called and testified to similar statements as Betty Beyer; that Mrs. Meinel told her of having spoken to Mrs. Schmidt at a card party at the Bellevue Stratford in December, 1928. Mrs. Schmidt had fixed the conversation with Mrs. Meinel as having been by telephone in January, 1929. Mrs. Tripple stated that she never told anyone about the matter until a time when "Mr. Meinel and Betty Beyer were talking about it and they asked me if I knew anything about it, and I said, 'Yes, Mrs. Meinel told me.'" This would tend to contradict Betty Beyer's statement that she never told anyone.

The entire testimony in relation to this charge, the most serious made by libellant, is of such character as to leave the whole matter very much in doubt.

Another circumstance which stands out in connec-

tion with this case, is that Mr. Meinel's mother who lived in the house from the time of the marriage until January, 1926, was not called as a witness. She, above all others, could have testified as to the conduct of respondent.

Respondent denied that she said to anyone that libellant was an atheist. The only witness who testified to this alleged statement was Guy P. Bible who fixes the date of the conversation as a day or two after Mr. Meinel had left the home. It therefore could not have been an inducing cause in his leaving.

Respondent denied that she ever accused her husband of going with bad women.

With the status as disclosed by the testimony to which we have referred, libellant withdrew from his home on March 19, 1930. The libel was promptly filed on March 21, 1930, two days thereafter. Mrs. Meinel testified that he did not tell her that he intended to leave. On the morning he left he told her that he was going to a director's meeting in New York that day, that he might not be home that night, and if he did not come home he would send a telegram. Arrangements had been made that morning, at the instance of Mr. Meinel, for Mrs. Meinel to attend a theater party with Mrs. Bible. They went to the theater, returning about five o'clock; found the furniture van in front of the drive and Mr. Meinel across the street in his machine; the child and the others had gone and there was no one in the house. Mrs. Meinel went out and yelled after Mr. Meinel but he drove away without answering her; the furniture van moved off. Neither servant had said anything to Mrs. Meinel about leaving. Mr. Meinel had left a letter for her dated by him the night before, wherein he stated that he had gone and taken their little daughter with him and that he was immediately bringing divorce proceedings.

Mrs. Meinel described an incident occurring after her husband left her, when she went to Beach Haven with other persons, in an effort to get her child, where she had been taken by Mr. Meinel. She failed and the libellant or his mother caused her to be arrested. She had to get bail and the charges thereafter were withdrawn.

The leaving of his home by Mr. Meinel had apparently been contemplated for some time. Two years before, he had told Mr. Bible that he thought eventually he would have to secure a separation.

On March 19, 1930, the men loaded into the vans, under the direction of Mr. Meinel, the articles he desired to be moved. Although he had said nothing to Mrs. Meinel regarding his departure, he told the two servants, Mrs. Tripple and Betty Beyer, that morning before he left home.

The record in this case covers 1265 printed pages. The testimony covers 1098 pages. On account of the earnestness with which this case has been contested, and the elaborate briefs which have been furnished by both sides, we have read and carefully considered the entire testimony. The case is most unusual in character. It presents a case where a man of unusual ability and determination, through his own efforts and application acquired an education; after finishing grammar school at the age of fourteen, attended for six years Franklin Institute at night and took courses in mechanical engineering, mathematical drawing, mathematics, applied mathematics, strength of materials and structural designs. In 1922 or 1923 he took an evening business course at Temple College. At the age of 21 he married Jennie Miller, the respondent. At that time he was employed as a foreman in the machine shop of the Nazel Engineering and Machine Works, Philadelphia. He entered the employ of E. G. Budd Manufacturing Co. in 1916, as

an inspector on tool work. In 1925 he was made assistant works manager, and in 1927 he became works manager and "carried the full responsibility of all manufacturing departments in the Philadelphia plant." In 1928 he became vice-president of the company in charge of manufacturing covering Philadelphia and Detroit. He apparently loved his work, and his hours of labor knew no limit, often after working all day, leaving home at 6:30 in the morning and returning between 5 and 6 in the evening, again going to work in the evening. He also worked Sundays. As vice-president, he had under his control as many as 8,000 men, and not less than 4,000 men, in the two plants. When he married he was earning $21 a week. When he started with the Budd Company he received $28 weekly, and in 1929 his salary was $16,500. In 1930 his salary was increased to $1,700 a month. In addition he secured cash bonuses and a bonus of stock each year.

The same methodical manner and characteristics which entered into his industrial life, bringing the remarkable advancements which he achieved, no doubt entered into his married life, but unfortunately not producing as desirable results. He testified, quoting his own language, " 'I did not propose marriage to Mrs. Meinel until she had convinced me that she considered herself most fortunate in being helpful to my mother.' 'Q. Did you make any bargain with your wife immediately before or at the time you were married, as to what she was to do in the house and what your mother was to do? A. I had that understanding with Mrs. Meinel before we were married, what each one was to do. Mrs. Meinel was to take care of the heavy work, leaving to my mother the light work that she might be able to take care of. Q. What do you mean by heavy work? A. It was understood that Mrs. Meinel would take care of the washing, the houseclean-

ing and the preparing of my breakfast in the morning. Mother was to prepare dinners ......' 'Q. This division of the household duties was the result of a bargain, was it? A. That was understood as a bargain with Mrs. Meinel.' 'Q. Then you had planned it all out as to what each of the two women were to do in the house. A. Very definitely.' And when his wife did not perform to his satisfaction he 'pointed it out to her quite often. ...... Sometimes once a week, other times four or five times a week.' He 'began to think she was not a good wife' ...... and he says, 'I got that notion in my head shortly after we were married.' 'Q. And it persisted up until the time you left Mrs. Meinel? A. Yes, sir.' "

He attributed his attacks of temporary blindness to his unhappy domestic life, forgetting the self-imposed strain in his long hours and application to work. He also failed to realize the terrible price he was paying by devotion to his work thereby contributing to the estrangement between him and his wife. Quoting from his testimony: " 'Mrs. Meinel always pleaded with me to sleep with her.' 'Mrs. Meinel constantly came into my room complaining of my having left her.' 'Her treatment of me was such that I naturally had very little desire for sexual intercourse and during the last two years it usually was the result of her coming to me, rather than my going to her.' When Mr. Meinel returned from Pinehurst, he found that his wife had put her clothing in his room, and he testified: 'She was going to sleep with me, she would no longer tolerate my remaining at night in a room other than the one she was in.' Whereupon he took his bag and spent the night at Penn Athletic Club."

The ground for divorce, in this case, as alleged in the libel, is that respondent offered such indignities to the person of the libellant as to render his condition intolerable and life burdensome, thereby causing him

to withdraw from his home and family on or about March 19, 1930.

It is our duty to examine the evidence de novo for the purpose of review. Quoting what was said by Mr. Justice WALLING in Nacrelli v. Nacrelli, 288 Pa. 1, 4; 136 A. 228: "Under section 7 of the Act of May 5, 1899, P. L. 248, 250, appeals in divorce cases were transferred to the Superior Court. Prior thereto we had held in a uniform course of decisions that appeals in divorce cases brought up the entire record, including the evidence, which it was our duty to carefully examine and determine whether on the facts the trial court had reached a correct conclusion." See also Langland v. Langland, 108 Pa. Superior Ct. 375. In Esenwein v. Esenwein, 312 Pa. 77, Mr. Justice LINN said: " 'It is not of a single act that the law speaks in the clause under which this case falls; but *of such a course of conduct* or *continued treatment* as renders the wife's condition intolerable and her life burdensome ......  Never ought divorces to be easily obtained, for marriage is the most sacred of human relations, and should never be dissolved without clear proof of imperious reasons ...... Indignities provoked by the complaining party are of course no ground of divorce unless the retaliation is excessive': Richards v. Richards, 37 Pa. 225. See, also, May v. May, 62 Pa. 206, 210; Angier v. Angier, 63 Pa. 450, 458; Sowers's Appeal, 89 Pa. 173; Edmond's Appeal, 57 Pa. 232; Middleton v. Middleton, 187 Pa. 612, 615, 41 A. 291; Nacrelli v. Nacrelli, 288 Pa. 1, 7; 136 A. 228; Krug v. Krug, 22 Pa. Superior Ct. 572; Hexamer v. Hexamer, 42 Ibid 226; Ponthus v. Ponthus, 66 Ibid 257; Stewart v. Stewart, 88 Ibid 1, 5; Twaddel v. Twaddel, 95 Ibid 429, 432. 'Our statute is a municipal regulation for the protection of the community as well as the wife or husband': McDermott's App., 8 W. & S. 251, 256.

"In considering whether there is the 'clear and satisfactory evidence of the wrong which the law treats as justifying cause for a divorce. ...... The court must be informed what the respondent has done; not what witnesses may conclude, or what they may regard as the character of the conduct.' Edmond's App., supra. General expressions 'are of no value unless accompanied by the actual facts on which these assertions are based. We are entitled, in the consideration of the case, to have the particulars as to the words spoken or the things done that constituted the cause of action alleged': Ford v. Ford, 67 Pa. Superior Ct. 350, 352; Bishop v. Bishop, 30 Pa. 412, 415.''

It has been repeatedly stated that "it is impossible to lay down a general rule for the determination of what indignities render the condition of the injured party intolerable." Each case must be decided upon its peculiar facts.

We have already discussed the testimony in relation to the charge that the libellant was committing self-abuse, one of the most serious charges contained in the bill of particulars, and do not think that it is established by the degree of evidence required. The same also applies to the alleged accusation that libellant was committing adultery.

The other charges do not, in our judgment, constitute "Indignities to the person," entitling libellant to a divorce. Persons too often forget, that in entering into the contract of marriage, they take each other for better or worse, in sickness and health. Not all marriages are made in Heaven, nor are capital prizes equally distributed.

Despite the fact that a divorce was recommended by the master, and his recommendation affirmed by the court below (the President Judge dissenting) we do not find sufficient evidence in the record to warrant an affirmance of this decree.

"We have said many times that in the granting of a divorce on the ground of cruel and barbarous treatment and indignities to the person, the evidence should be very clear, and unambiguous.

" 'Courts ought never to sever the marriage contract but where the application is made in sincerity and truth for the causes set forth and no other, and fully sustained by the testimony.' The marriage should never be dissolved without clear proof of imperious reasons: Hexamer v. Hexamer, supra; Ponthus v. Ponthus, supra; Lacock v. Lacock, 74 Pa. Superior Ct. 378; Biddle v. Biddle, 50 Pa. Superior Ct. 30; Wark v. Wark, 73 Pa. Superior Ct. 274'': Forrester v. Forrester, 77 Pa. Superior Ct. 364, 367.

Examining the entire evidence in the light of these principles, we are driven to the conclusion that the divorce should not be granted because the proofs do not come up to the required standard.

The decree is reversed, and the record remitted to the court below with direction that the libel be dismissed. Costs to be paid by libellant.